(No. 45356.—

WILLIAM BASKETFIELD, Appellee, v. THE POLICE BOARD OF THE CITY OF CHICAGO, Appellant.

*Opinion filed January 31, 1974.*

Richard L. Curry, Corporation Counsel, of Chicago (William R. Quinlan, Thomas J. Cachor, and Daniel Pascale, Assistants Corporation Counsel, of counsel), for appellant.

Charles A. Bellows, of Chicago, for appellee.

PER CURIAM: Appellee, Lieutenant William Basket-field, filed a complaint for administrative review in the circuit court of Cook County (Ill. Rev. Stat. 1969, ch. 110, par. 264 *et seq.*) seeking to set aside a decision of the

Police Board of the City of Chicago, appellant herein, which had ordered that he be discharged from the police department. The circuit court reversed this decision and ordered that appellee be reinstated solely because the administrative findings were contrary to the manifest weight of the evidence. The appellate court affirmed, one judge dissenting (6 Ill. App. 3d 370), and we granted leave to appeal. The principal issue presented concerns the permissible scope of evidentiary review in these proceedings.

After a hearing appellant issued its decision finding that Basketfield had violated certain departmental rules. It concluded that he had committed an unlawful act by obtaining control over a quantity of lost or mislaid tires and, although he knew or could have known of the owner, he failed to reasonably act to return the tires, with the intent to deprive the owner of them; that he committed acts of official misconduct for the reasons heretofore specified; that he conspired with two other police officers to retain unauthorized control of the tires for their personal benefit; that he failed to comply with "the provisions of General Order 67—21, when alleged misconduct by members of his command was brought to his attention"; that he failed to comply with the order of a superior officer to conduct an investigation into alleged misconduct; that he gave false information in an official report on November 4, 1967; and that he failed to report the alleged unlawful conduct of members of his command to his superiors.

It is undisputed that on October 10, 1967, about 60 tires belonging to the Vogue Tyre and Rubber Co. were stolen. A number of these tires were Vogue brand and were wrapped, and the remainder were "standard equipment" tires used on new cars. Officer Jack Muller of Area 5 Auto Theft was assigned to the investigation. On Wednesday, October 18, Officer Cyril McCarthy of Area 2 Auto Theft, in accordance with an assignment, had a

conversation with a man who told him about a garage located on the south side of Chicago. McCarthy examined the garage but saw only a car parked in it. Because of his inability to carry on his investigation due to illness, on Thursday morning he contacted Basketfield, who was the Area 2 unit commander. He advised him that tires would be stored in the garage and that the area should be placed under surveillance particularly at night. McCarthy had no knowledge of any report regarding stolen tires. Marks Cohen, the owner of an auto supply shop, testified that late Thursday afternoon Officers Walsh and Murray of Area 2 Auto Theft delivered about 20 tires to his shop. Some of these were Vogue tires and were wrapped, others appeared to have been used. Friday afternoon, October 20, Officer Frank Lynch went to the supply shop and, pursuant to Walsh's earlier telephone instruction to Cohen, these tires were placed in his police car and delivered to Area 2 headquarters about 2:30 P.M. They were later marked with the initials "J.M.", and returned to their owner at 5:00 P.M. that day.

Elzie Norswether testified that on October 19, at the request of Walsh and another officer, he opened the garage located behind his home and there saw a number of tires, some of which were wrapped. He said that he then left. The next day he and Muller re-entered the garage and found no tires. They proceeded to Area 2 headquarters where he saw Walsh. Norswether and Muller went out to the station parking area and waited in a police car. Shortly thereafter they observed a vehicle being driven into the lot and saw that it contained many tires. Muller went to the vehicle and began to mark the tires.

Frank Lynch testified that he drove the car into the lot and did not see Muller. He gave the car keys to Walsh but did not inventory the tires although such procedure would be required. About two weeks later Lynch spoke to Basketfield concerning a statement which the former was to give to the police Internal Investigation Division in

regard to the tires. He said that Basketfield asked him to disclaim any knowledge of transporting the tires to the station in an effort to prevent Walsh and Murray from being "dumped." Lynch said that he agreed and then made a false statement asserting that the tires had never been taken from the station. Lynch admitted that his lawyer, after conferring with members of the State's Attorney's office, had told him he would be indicted if he did not tell the truth.

Jack Muller testified that after he spoke to Norswether, looked in his garage and canvassed the area to determine if any resident saw policemen removing tires, he called numerous police stations in the vicinity including Area 2 Auto Theft to determine who may have taken the tires. He and Norswether went to Area 2 headquarters but after a thorough inspection found no tires in the "lock-up" section. After unsuccessful attempts to locate the tires in the burglary and auto theft divisions located in this building, Muller spoke to Officer Beckman, who informed him that Walsh knew about the tires. Muller and Norswether returned to the car and waited until the vehicle driven by Lynch arrived. Lynch walked away without responding to Muller's inquiry as to his identity. Muller noted the time of arrival at 2:22 P.M. and in Walsh's presence initialed the tires which were wrapped in gold foil and stamped with the name "Vogue."

Muller then went to Basketfield's office from where he had a telephone conversation with his superior, Lieutenant Fisher. Basketfield came in at 3:45 P.M. and, according to Muller, stated that the latter had interfered with his luncheon date at the "country club." Muller claimed that Basketfield took a radio from his desk and turned it on so that their conversation could not be overheard. At this point Walsh entered and Muller criticized his conduct and informed Basketfield that Walsh had created a difficult situation. He further said to Basketfield that Walsh told him of Basketfield's knowledge that the

tires had not been brought to the station for inventory and their arrangement to sell the tires and divide the proceeds if the tires did not "turn up hot." In response to this accusation Basketfield purportedly admitted that it was true and asked Muller for a "break" but the request was refused. Muller and Walsh left Basketfield's office about 3:50 P.M. and Walsh inventoried the tires. This was completed in 10 minutes and the inventory book was returned to Officer Bangert.

During cross-examination it was established that Muller had compiled notes on scraps of paper on the day of the confrontation with Basketfield. However, only the notes referring to the type of car driven by Lynch, its license number and the quantity of tires it contained were available. Muller explained that on October 21, in Area 5 headquarters, he rewrote his notes which pertained to his recollection of the events which transpired with Basketfield the previous day. He inserted certain matters which he recalled and made some corrections. He tore the original notes and threw the pieces in the toilet. He placed the rewritten notes in his police locker and subsequently took them to a relative's home in Wisconsin because he wanted no one but the State's Attorney to know of their content during the pending investigation. Muller produced these notes during a court hearing on criminal charges which were later brought against Basketfield relating to this matter and which resulted in his acquittal after a jury trial.

Comparison of Muller's notes with his testimony at the disciplinary hearing reveals that references to many of the statements purportedly made by Basketfield were not contained in the rewritten notes. It was determined that an official police report compiled by Muller on November 5, 1967, referred to several portions of the alleged conversation not set forth in his rewritten notes. This report was made one day after Basketfield was again questioned by Muller in the presence of a deputy chief of police.

Basketfield denied any wrongdoing during this interrogation.

Officer John Beckman, who was assigned to Area 2 Auto Theft, testified that he received a call from Muller on the morning of October 20. He asked other officers about the tires and checked the inventory book at 9:00 A.M. but did not find any entry evidencing recovery of the tires.

Sergeant John Bangert also spoke to Muller about 9:30 A.M. When he saw Basketfield that morning, he informed him that Muller had made two inquiries concerning the tires but the inventory records disclosed that none had been recovered. He said that Muller came to the station in the afternoon with another man and at 4:00 P.M. Walsh inventoried 18 tires which were listed as having been recovered the previous day. When Bangert showed Basketfield the inventory book, the latter said he could indicate the date (October 20) that he was signing the inventory. Bangert signed but did not designate the date.

Captain Francis Lynch, the commander of the auto theft section which included Area 2, testified that on Monday, October 23, Basketfield told him of the incident. Basketfield informed him that about 9:00 A.M., on October 20, Walsh had notified him of the recovery of the tires the previous day and until Muller spoke to him that afternoon he had assumed that these items had been inventoried and placed in the "lock-up." Captain Lynch instructed Basketfield to obtain written reports from Walsh and Murray concerning the incident. Basketfield disclosed to him that Murray was presently on furlough but was due to return about October 31. On November 10, Basketfield informed Lynch that the reports were complete, but Lynch would not accept them because Lynch was then under investigation for his conduct in the matter. Lieutenant Ervanian of the Internal Investigation Division said that reference had been made to these reports but he could not recall ever having seen them.

Officer Daniel Vukadinovich testified for the appellee that on October 20 he drove Basketfield to a nearby restaurant for lunch. Later they traveled about the area pursuant to their administrative duties and returned to the station at 3:30 P.M. He did not see a car that contained tires.

Basketfield confirmed the communication with Officer McCarthy on October 19. He testified that he chose Officer Jones to conduct the surveillance of the garage because Jones worked the 5:00 P.M. to 1:00 A.M. shift. It would appear that Jones was unable to fulfill the task, for on that day he was not scheduled for duty. Basketfield denied that he assigned Walsh and Murray to the case or that he had participated in any wrongdoing.

Basketfield testified that between 8:00 and 9:00 A.M. the following morning (October 20) Walsh told him about discovering the tires as a result of an anonymous telephone call. At this time Basketfield said that he did not know if any tires had been reported stolen and he instructed Walsh to check into the matter. At 9:30 A.M. Bangert informed him of Muller's inquiry but Basketfield denied that he had been advised that no inventory was of record.

Basketfield asserted that upon his return to the station that afternoon he did not see any vehicle containing tires. He entered his office and saw Muller, who was telephoning his superior. Basketfield talked briefly with Lieutenant Fisher, who purportedly informed him of Muller's discontent concerning the treatment he was receiving in his attempt to recover the tires. Basketfield claimed that he told Muller there was no problem because the tires were in the "lock-up" and listed in the inventory book. Muller then told him that the tires were downstairs but there was no inventory entry to this effect. Walsh was summoned and he said that the tires were now inventoried and Basketfield instructed him to list October 19 as the recovery date and to have Bangert sign the register listing

October 20 as the date of his acknowledgment. Basketfield said that Walsh told him that Murray was to have completed the inventory procedure.

Basketfield went to see Captain Lynch concerning another matter on October 23 and was then instructed to procure reports from Walsh and Murray. He received a formal statement several days after the conversation with Captain Lynch, but due to Murray's furlough his report was not immediately obtained. Basketfield said he was told by Captain Lynch to keep the reports until they were requested. Finally, Basketfield maintained that as he was waiting outside an office on November 10 he overheard Captain Lynch being questioned by three deputy police chiefs. He entered and placed the reports on the desk. No copies were made and Basketfield said that Lieutenant Ervanian left them on the desk. He expressed familiarity with general police orders requiring a commanding officer to investigate misconduct on his own initiative without being directed to do so by higher authority. However, he did not recall a regulation stating that " 'Alleged or suspected violations will be reported to the Internal Investigation Division by the superior or commanding officer who first receives information of the alleged violation even when it is believed to be unfounded,' " and he conceded that he made no such report.

Initially appellant seeks to have this court apply a "substantial evidence" standard as used in the Federal system for review of administrative matters (5 U.S.C. sec. 706(2)(E)). It suggests adaptation of the *Pedrick* norm to define the term "substantial evidence." (*Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill.2d 494, 510.) We reject this contention. Under the Administrative Review Act the permissible scope of judicial inquiry concerning factual determinations by administrative agencies has been limited to ascertaining if the agency decision was contrary to the manifest weight of the evidence. (*Davern v. Civil Service Com. of Chicago*, 47 Ill.2d 469, 471-2, *cert. denied*, 403

U.S. 918.) This court, however, will not hesitate to grant relief where the record does not disclose evidentiary support for the agency's determination. *Harrison v. Civil Service Com. of Chicago,* 1 Ill.2d 137.

The charges involving Basketfield's complicity with Walsh and Murray in regard to recovery of the tires are based solely on the testimony of Officer Muller. Although there is no specific indication in this record concerning the matters contained in the report Basketfield made during his interrogation on November 4, we must assume that this allegation stemmed from his denial of any collusion with Walsh and Murray in obtaining the tires. The foundation for the determination of the falsity of his response therefore rests on Muller's version of their October 20 conversation.

The testimony of Basketfield and Muller was conflicting. However, there was more than a mere variance in testimony. In this case Muller's credibility was materially impaired. It appears that many statements which Muller attributed to Basketfield were not contained in his rewritten notes on October 21. Some statements were not mentioned in Muller's official report of the matter. While destruction of the original notes does not *per se* require exclusion of Muller's testimony, as is suggested (*cf.* 31A C.J.S., Evidence, sec. 153), we find that his action tends to diminish his credibility. Muller's testimony regarding Basketfield's luncheon at a "country club" is directly refuted by the testimony of Officer Vukadinovich. Moreover, Basketfield's directive to Sergeant Bangert to list the date of the inventory entry as October 20, thereby preserving the discrepancy of the recovery and inventory dates is hardly indicative of an individual who was involved in an attempt to profit from recovery of the tires. We find from examination of the record that Muller's testimony relating to Basketfield's guilt as to the aforementioned charges was totally discredited and its acceptance was contrary to the manifest weight of the evidence.

We further conclude that the charge that Basketfield failed to report the incident to his superior officer is unfounded. The evidence of possible wrongdoing became apparent during the afternoon of Friday, October 20, and Basketfield proffered information on the matter to Captain Lynch the following Monday. We agree with the appellate court majority that to fault Basketfield for this delay in view of the intervening weekend period would be arbitrary where no evidence was presented to support a conclusion that the delay was unreasonable.

The remaining allegations against Basketfield concern his efforts in pursuing the subsequent investigation of the matter. Here, we find that the evidence presented various factual considerations involving administrative procedures which would primarily require the Police Board's expert evaluation. There is also the conflict between Basketfield and Captain Lynch concerning disposition of the reports. After review of the record, we cannot say that the Police Board's decision was contrary to the manifest weight of the evidence.

The findings of the Police Board that Basketfield committed an unlawful act by obtaining unauthorized control of the tires with the intent to deprive the owner of these items; that he was guilty of official misconduct for his actions as heretofore specified; that he conspired with Walsh and Murray to gain unauthorized control of the tires; that he rendered a false report of the incident in an official report given on November 4, 1967; and that he failed to promptly notify superior officers of the misconduct of members of his command cannot be sustained. Accordingly, the judgment of the appellate court as to these charges is affirmed. The Police Board findings that Basketfield failed to conduct a proper investigation pursuant to applicable police regulations and failed to comply with an order of his superior regarding such matter may be sustained by the evidence. Accordingly, the judgment of

the appellate court relating to its disposition of these matters is reversed.

The most serious charges cannot be sustained, and in fundamental fairness we believe that the sanction imposed in this instance might well differ were only the charges that have been sustained the basis for disciplinary action. We therefore remand the matter to the Police Board to reconsider the appropriate disciplinary action to be taken against Basketfield who, since he became a police officer in 1953, had no prior complaints concerning the performance of his duties.

*Affirmed in part, reversed in part and remanded, with directions.*