RENATO L. TANQUILUT, M.D., Plaintiff-Appellant, *v.* THE DEPARTMENT OF PUBLIC AID, Defendant-Appellee.

First District (2nd Division)   No. 78-1271

Opinion filed October 16, 1979.

Wildman, Harrold, Allen & Dixon, of Chicago (Douglas R. Carlson and Anne Giddings Kimball, of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Ellen P. Brewin, Assistant Attorney General, of counsel), for appellee.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

In February of 1978, plaintiff, Renato L. Tanquilut, M.D., petitioned the circuit court of Cook County for judicial review of the administrative action of the Illinois Department of Public Aid (IDPA) terminating his eligibility as a vendor of medical services. The circuit court affirmed the IDPA decision, barring plaintiff from continued participation in the Medical Assistance Program.

On appeal, plaintiff challenges both the factual basis for the findings and conclusions by the IDPA which resulted in his suspension and the procedural application of the termination statute. He further contends that the statute authorizing termination of medical vendors is constitutionally deficient both on its face and in its application.

In 1972, plaintiff Tanquilut and another physician maintained a medical practice, organized as a partnership, and operated under the name Hilltop Medical Center (Hilltop). Sometime before May of that year, Hilltop purchased from Englewood Hospital the building in which their medical center was located. Prior to the sale, the hospital had operated a pharmacy in that location, employing Bernard Scavella, a licensed pharmacist. After the sale was completed, Hilltop solicited Scavella to open and manage a pharmacy within the newly acquired building. On May 1, 1972, Hilltop entered into a lease agreement with Scavella which ran from May 1, 1972, through April 30, 1974, with an irrevocable option giving the lessee the right to extend the lease for two years at the same rental.

Scavella paid nothing for the pharmacy as a going concern. Rather, Hilltop financed the $15,000 pharmacy inventory and provided heat, light, janitorial services, parking facilities, water, scavenger service, and storage space in the basement. Prior to the negotiations concerning the lease terms, Scavella, having had previous experience only as an employee and not as a manager, studied Lilly's Digest and learned that the average pharmacy expenditure for cost of goods sold was approximately 67% of gross receipts. As Scavella testified at the later administrative hearing:

> "When I met with the doctors and their attorney and their business consultant in 1972, this was the figure that I projected, and it was worked at that particular point if the cost of goods sold was 67%, that was all right, but if the figures fell less than that, the difference between the actual proposed cost of goods sold, 67% and what I actually did buy, was to be computed, and 80% of the difference would be additional rent, between the two figures of 67% and the actual."

The lease specified that the base rental was $4,000 per month or 12% of the gross collections for professional services less the monthly rent.

Additionally, the 67% figure was used to provide for the possibility of increased rent, designated as "incentive rent" in the lease agreement.

At the time of the signing of the lease, both Hilltop and Scavella agree, an oral agreement was made allowing for lease renegotiation if there were problems with the amount of rent being paid. The agreement also provided for repayment of the $15,000 pharmacy inventory from money received by the pharmacy.

On December 30, 1976, Dr. Tanquilut was notified by the IDPA that his eligibility to participate in the Medical Assistance Program was terminated and that payments would be suspended as of that date. The bill of particulars which alleged the grounds for termination included, *inter alia*, charges of violation of Federal law and of receipt of kickbacks and rebates.

A formal administrative hearing was held on February 14, 1977, at which witnesses were called to testify to the terms and practical effect of the lease. The IDPA's first witness was the pharmacist, Scavella. He detailed the terms of the lease and further testified that Ridge Pharmacy, which he leased at a later time, was approximately the same size but rented for $1,500 less per month than Hilltop. No other comparisons were made between these two facilities.

On cross-examination Scavella explained that the $4000 base rental for the Hilltop Pharmacy was based upon figures that Englewood Hospital, the former owner, had submitted. He also testified that as a yearly employee of Englewood Hospital he earned $14,000 whereas in the same facility as sole proprietor he made $59,000 to $60,000 a year. Hearing officer Dixon also asked Scavella a few questions regarding his impression of the leasing arrangement:

> "Dixon: Did you think the deal on its face was oppressive?
> ✿ ✿ ✿
>
> Scavella: No.
> Dixon: Did you make money, doctor?
> Scavella: Yes, I did.
> Dixon: Are you disenchanted now?
> Scavella: I am disenchanted primarily because of the fact there is a payment of money that is due me from the doctors I haven't received from the inventory."

The second witness was Arthur Dilay, employed by the IDPA as an accountant in the Department of Medical Audits, who conducted the audit of Dr. Tanquilut. Dilay testified that he had audited the books of Hilltop Pharmacy for the period of May 1972 to October 1976. Dilay's computation of the overall percentage of rental payments since 1972 was 10 to 15 percent. Hearing Officer Dixon recomputed this percentage as 22.2 in the hearing report but did not include the basis for his figure.

On recross Dilay testified that Scavella operated two other pharmacies in nearby areas, neither of which had been audited but whose books reflected rents for a one-year period as being 16 and 19 percent of gross sales, referred to by the hearing officer as 27.6% and 21.4%. The witness stated, in response to questions by the hearing officer, that he had read an article which classified rent above 15% as being exorbitant. He did not clarify this statement as to services included in the rent or the type of property or agreement concerned. He also gave the opinion that the pharmacy under the lease in question was a good business venture but revealed that he did not consider himself to be an expert in determining fair market value of rental space.

The third witness called by the department was Matthew Bachman, acting unit supervisor of the medical audit section, bureau of medical audit and review, Department of Public Aid. He stated that he had checked a nearby rental property to ascertain comparable lease arrangements. He admitted, though, that he had not spoken to the owner, but instead gained his information through the pharmacist employed at the comparison site. Since Bachman did not have his notes with him, he could only give his estimate as to the size of the property. Further, although Bachman had asked the sample pharmacy's rent ($300 per month including utilities and garbage), cross-examination revealed that data relevant to a valid comparison (floor space, profitability, storage space, security services, parking, receptionist, switchboard facilities, interest and loans from lessor to lessee, buy-out value of the business as a growing concern, gross sales, scope of sale activities, lessor, and other aspects of the lease) had not been elicited in seeking a prototype.

Plaintiff called only one witness, Alan Diener, a management consultant, who participated in the negotiations leading to a lease arrangement between Scavella and Hilltop. He testified that the lease was a solid business deal with no kickbacks, rebates or bribes involved.

Hearing officer Dixon submitted a nine-page document to the director of IDPA, reviewing and examining the evidence. He found no evidence of kickback, rebate or bribery, and recommended that Tanquilut not be terminated by the IDPA. The director, Arthur Quern, terminated Tanquilut, concluding, as against the recommendations of the hearing officer, that the lease agreement was a kickback scheme. The termination was effectuated on July 22, 1977.

Tanquilut filed a complaint in the circuit court of Cook County seeking judicial review of the administrative decision. In October, 1977, a motion for summary judgment was filed alleging that based upon the Illinois Supreme Court decision in *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 370 N.E.2d 223, the department had no power to terminate him. Summary judgment was granted on this basis, Dr. Tanquilut was reinstated, and the IDPA took no appeal.

Effective December 1, 1977, the Illinois legislature enacted an amendment to the Illinois Public Aid Code which provided the department with specific authority to terminate medical vendors. (Ill. Rev. Stat., 1978 Supp., ch. 23, par. 12—4.25.) This deficiency of statutory termination power had formed the basis of the decision in *Bio-Medical Laboratories*. Pursuant to the newly revised section of the code, the IDPA notified Dr. Tanquilut that he was again terminated as a medical vendor based upon the evidence contained in the hearing report which had resulted in the previous termination. Specifically the suspension notice stated:

> "This decision is based * * * on the findings that you paid excessive rent[1] to a Medicaid provider in violation of 42 USC §1396(h) and you entered into an agreement which contained a rent escalation clause in violation of that same section."

Dr. Tanquilut again requested judicial review of that administrative decision and filed a petition in the circuit court. His subsequent motion for a temporary restraining order and preliminary injunction was denied. The circuit court affirmed the termination and Dr. Tanquilut appealed.

Perhaps the most basic challenge to an administrative decision is the claim that the agency's action has no foundation in fact and is thereby against the manifest weight of the evidence. Those contentions of plaintiff which are based on issues of res judicata, improperly drawn curative acts, and statute unconstitutionality need not be resolved by this reviewing court if the IDPA decision is not supported by the evidence. Indeed, it is well established that the constitutionality of a statute should be decided only where necessary to the disposition of the case. (*E.g., Bender v. City of Chicago* (1974), 58 Ill. 2d 284, 319 N.E.2d 34; *Hawthorne Kennel Club v. Swanson* (1930), 339 Ill. 220, 171 N.E. 140.) We decline, therefore, to consider those contentions raised by plaintiff concerning the res judicata effects of statutory application and the constitutionality of the medical vendor statute both in its application and on its face, since we feel that the threshold issue of whether the findings by the IDPA are against the manifest weight of the evidence is dispositive.

■▌ Judicial review of administrative decisions by the IDPA is governed by the Administrative Review Act (see Ill. Ann. Stat., ch. 23, par. 12—4.25(F)(Smith-Hurd 1979 Supp.)) and therefore is limited to ascertaining whether the action was against the manifest weight of the evidence.

---

[1] The mistaken usage of "paid" instead of "received" has been explained by IDPA as a typographical error. It has been challenged on a substantive basis by plaintiff. We need not consider the effect of this error, if any, in view of our holding on the facts.

(*General Electric Co. v. Illinois Fair Employment Practices Com.* (1976), 38 Ill. App. 3d 967, 349 N.E.2d 553; see also Fins, *Need for Uniformity in Judicial Review of Administrative Decisions*, 61 Ill. B. J. 366 (1973).) For this review the factual determinations upon which the agency's conclusions are based "shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1977, ch. 110, par. 274.) Also, counterbalanced against the policy of insuring the integrity of the administrative process is the duty of the court to set aside a finding where it is clearly contrary to the facts presented. See generally *Fantozzi v. Board of Fire & Police Commissioners* (1963), 27 Ill. 2d 357, 189 N.E.2d 275; accord, Illinois Administrative Practice and Review Commission Report 5-11 (Chi. Bar Ass'n 1945).

Further, it has been suggested that where, as here, the proceedings are civil in nature but conduct constituting a crime is charged (see 42 U.S.C.A. 1396h (1979 Supp.) (felony to accept a kickback)), the nature and quality of the evidence adduced at the hearing should be held to a more exacting standard. "While we adopt and hold that the charge need only be proved by a preponderance of the evidence, * * * we believe that the evidence of guilt should be clear and convincing." (*Drezner v. Civil Service Com.* (1947), 398 Ill. 219, 227, 75 N.E.2d 303; see also *Wilkey v. Illinois Racing Board* (1978), 65 Ill. App. 3d 534, 381 N.E.2d 1380.) Whether or not the additional burden of the *Drezner* test applies here, under either standard there is no support for the IDPA decision to terminate Dr. Tanquilut based upon the facts presented at the hearing.

Statements made by both attorneys during the original administrative hearing indicate that the December 1976 letter notifying Tanquilut of his termination for lease-related violations was actually preceded by a letter of November 15 which purported to suspend plaintiff for improper prescription of drugs, overutilizing, and improper billings. That suspension was lifted soon after it was instituted and before the present charges were brought. Even though the IDPA would have us consider the lease as if charges of patient steering and improper prescriptions had been evidenced, that is not the case. The only evidence produced during the administrative hearing concerned the lease between Hilltop and the pharmacy. It would be grossly unfair to assume impropriety and then examine the lease in that context.

We are well aware that the department is attempting to forestall serious welfare abuses. The Committee Reports on Federal welfare legislation detail the fraud and corruption attendant to the "medicaid mill." (1977 U.S. Code Cong. & Admin. News 3039, 3047 *et seq.*) However, descriptions and characteristics of "medicaid mill" operations are not evidenced in the case against Dr. Tanquilut; we are limited to that evidence presented at the administrative hearing.

Dr. Tanquilut is charged with receiving excess rent ("remuneration"—see 42 U.S.C.A. §1396h (1979 Supp.)) for the lease of a pharmacy to Bernard Scavella. Requisite proof of excess rent would be comparative market value for rentals in that area with the same characteristics, as against actual rent received. No probative evidence was presented on this point. The witness Bachman stated that he had checked a comparable rental but admitted that he had failed to ascertain sufficient similarities to validate its use as a prototype. The other witness who might have provided such a comparison was Arthur Dilay. Instead, he testified that he did not consider himself to be an expert in rental value and any appraisal he might give would be based on "an article" which, as he remembered it, made the general statement that those rental figures exceeding 15% of gross sales were exorbitant. The article was not identified or placed into evidence, making its value negligible at best. When Dilay was asked on cross-examination if he had computed the Scavella rent since 1972, he responded that the lease proceeds were approximately 10% to 15% of the gross sales, well within the article guidelines. A footnote to the hearing officer's report states "computation shows 22.2%." We do not know how these conflicting figures were derived or which is ultimately more accurate. Despite that, without evidence from either witness as to fair rental values, no foundation has been laid for a determination of whether the rent is excessive. Indeed, Dilay's only evidence that went to comparison values indicated that two other Scavella rentals were within 15% to 20% of gross sales for one year periods. There is no indication that Hilltop or Tanquilut have connections with these other pharmacies or what items and services were included in the rental. Additionally, the 15% to 20% figure of the other two pharmacies approximates that of his Hilltop rental.

Although called as a department witness, the pharmacist Scavella's testimony did not benefit the IDPA case. Rather, Scavella described the lease agreement as originating both from projections made by the former lessor, Englewood Hospital, and his own data derived from a pharmaceutical publication. The actual source of the 80% of excess net figure is not apparent from the record, but without evidence to the contrary, seems to be part of a regular business deal, not an illegal kickback scheme.

The department has neither proved illegal consideration nor introduced relevant, probative data from which such a conclusion might be derived. We find no basis in the record for the director's findings of excess remuneration. (See generally *Menning v. Department of Registration & Education* (1958), 14 Ill. 2d 553, 153 N.E.2d.52; *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 307 N.E.2d 371.) A conclusion to terminate Dr. Tanquilut must be based on the evidence adduced at the

hearing. Even if the director had a particular expertise in the area of the violations charged, that would not authorize a determination unsupported in the record. (*Metropolitan Sanitary District v. Pollution Control Board* (1975), 62 Ill. 2d 38, 338 N.E.2d 392.) Since we are unable to find support in this record for the finding that the rent is excessive, such a conclusion by the administrative agency is clearly contrary to the evidence presented and must be reversed.

If this lease is to be grounds for termination based upon violations of Federal and State laws pertaining to excess remuneration (kickbacks, rebates or bribes) then, without evidence that the rent was feloniously excessive, the charges may be proved in one of two other ways. Either there must be evidence of patient steering or excess prescription practices by the doctor in return for the lease agreement, or the lease itself must be so open a violation as to invoke some sort of per se rule, perhaps because of the percentage arrangement, against its very existence. We have already dismissed the first alternative as unsupported by the evidence; thus, the validity of the per se violation theory becomes dispositive of the IDPA case.

Although the congressional hearings anticipated that the Federal statute's enactment would help alleviate the abuses in the exorbitant percentage lease arrangements involving medicaid providers, there is no mention of such a lease as a per se violation. (1977 U.S. Code Cong. & Admin. News 3039 *et seq.*) At those same hearings, the percentage leases cited as clear abuses ran from 30% to 60% of gross sales. Using either figure for the Scavella lease (10% to 15% or the hearing officer's 22.2%), the base rental plus percentage arrangement falls below those cited. This is not to say that under proper proof this rent would not be excessive. However even the 80% "incentive rent" was not so closely tied to volume as to make this strictly a percentage rent lease. Rather, collection of the 80% incentive would be dependent on the efficient operation of the pharmacy in keeping its costs below the 67% figure estimated by Scavella. Volume may have had some impact on this additional rent, but not the absolute correspondence presumed by the IDPA. Without some specific statutory or legislative direction, we cannot label this lease agreement a per se violation for which a felony may be charged under Federal law.

The department contends that plaintiff Tanquilut has failed to properly present for review the factual issue of manifest weight of the evidence. Supreme Court Rule 341(e)(7) provides, "Points not argued are waived * * *." (Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7).) It is even claimed that Dr. Tanquilut has intentionally omitted the issue of factual basis for the director's actions, thereby abandoning this challenge on appeal. We disagree.

Although plaintiff's presentation of this claim was clouded by his

sometimes purely semantic arguments, Tanquilut's contentions relative to the basis for the actions of the director adequately raised the issue of manifest weight of the evidence. Plaintiff's claims that the conclusions of the director were unsupported by the factual findings of hearing officer Dixon cannot be considered without an examination of the evidence. Thus there was no waiver which would bar consideration of whether the director's action was against the manifest weight of the evidence.

We also note that one of the specific requirements of the section dealing with the scope of application of the amendatory act (Ill. Ann. Stat., ch. 23, par. 12—4.26 (Smith-Hurd 1979 Supp.)) is that the "vendor had actual or constructive knowledge of the requirements which applied to his conduct or activities." There is no such finding in the record relative to plaintiff's knowledge. Rather, this lease was entered into fully six months prior to the effective date of the Federal statute proscribing rent escalation clauses (42 U.S.C. §1396h (1976)) and while only the now void prior Illinois statute which provided no standards for termination was in force. (See Ill. Rev. Stat. 1975, ch. 23, par. 1—1 *et seq.*; *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 551-54, 370 N.E.2d 223.) Further, the Federal statute itself provides: "[T]his section shall not be applicable to any acts, statements, or representations made or committed prior to the enactment of this Act [October 30, 1972]." (Pub. Law 92-603, §242(d); see 42 U.S.C.A. §1396h, Historical Note (1979 Supp.).) Both statutes clearly provide that notice is not to be retroactively implied and when read together do not produce a retroactive notice statute. Although a finding concerning plaintiff's knowledge appears to be an essential prerequisite to retroactive application of the statute (Ill. Ann. Stat., ch. 23, par. 12—4.26 (Smith-Hurd 1979 Supp.)), we decline to consider any further the impact of this omission on the IDPA contentions because of our earlier holding on the facts.

Under any of the factual theories advanced, the decision of the IDPA director to terminate Dr. Tanquilut was against the manifest weight of the evidence. We are compelled to grant relief in accordance with appellant's prayer for relief and must reverse the decision of the trial court affirming the termination of Dr. Tanquilut from the medical assistance program.

Reversed.

PERLIN and HARTMAN, JJ., concur.