MICHAEL ARROYO *et al.*, Plaintiffs-Appellants, v. THE CHICAGO TRANSIT AUTHORITY, Defendant-Appellee.

First District (2nd Division)    Nos. 1—08—2441, 1—08—2482 cons.

Opinion filed September 8, 2009.

Ettinger, Besbekos & Schroeder, P.C., of Palos Heights (Michael D. Ettinger, of counsel), for appellants.

Eugene Munin, of Chicago Transit Authority, of Chicago (Kent Ray and Rachel Kaplan, of counsel), for appellee.

PRESIDING JUSTICE CUNNINGHAM delivered the opinion of the court:

Following an internal investigation into allegations of employee misconduct, the defendant, Chicago Transit Authority (CTA), terminated the plaintiffs, Michael Arroyo and Carl Horbach. Subsequently, a joint hearing was held for both plaintiffs under section 28 of the Metropolitan Transit Authority Act (Act) (70 ILCS 3605/28 (West 2006)), after which the CTA Transit Board (the Board) upheld the plaintiffs' terminations. Under a petition for common law writ of *certiorari*, the circuit court of Cook County affirmed the Board's decisions to discharge the plaintiffs. On appeal, the plaintiffs argue that: (1) the Board's findings were against the manifest weight of the evidence; and (2) the Board's decisions to discharge the plaintiffs were excessive, arbitrary and unreasonable. For the following reasons, we affirm.

# BACKGROUND

The plaintiffs were employed as quality improvement technicians (technicians) at CTA during all the relevant periods of time. As technicians, the plaintiffs were required to inspect and perform maintenance work at various CTA rail and bus terminals. The plaintiffs were assigned to work at different field locations during each workday and were typically required to travel to a maximum of three rail terminals during an eight-hour work period. Traveling employees, such as technicians, were authorized to use their personal vehicles for completing field assignments and could seek mileage expenditure reimbursements from CTA for any "chargeable mileage."[1] Any requests for mileage reimbursements must be completed on mileage record sheets and submitted by employees to their managers for approval.

In April 2005, Michael Bobko, a criminal investigator in the CTA's office of the inspector general (OIG), investigated accusations made in an anonymous complaint that six technicians, including the plaintiffs, were abusing CTA time, routinely failing to work full eight-hour days and exaggerating their mileage reimbursement claims. As part of Bobko's preliminary investigation, he reviewed the plaintiffs' January 2005 and February 2005 mileage records. The mileage records included information such as field work locations; arrival and departure times; odometer readings; chargeable and nonchargeable mileage; the nature of the assignment; and the total amount for reimbursements. Bobko discovered that the plaintiffs' odometer readings were always consecutive, without any breaks in the numbering to reflect night and weekend uses of their vehicles when the plaintiffs were not at work. Bobko suspected that the mileage records were fabricated. Further examination revealed that plaintiff Horbach frequently started or stopped his workday at one of two rail locations closest to his home, regardless of whether those locations were assigned work locations, thus allowing him to recoup five extra reimbursable miles. He would then spend the rest of the day driving long distances to different work locations, all of which was chargeable mileage. This resulted in nearly complete mileage reimbursement for each workday.

Consequently, Bobko presented the results of his preliminary investigation to Ralph Malec, general manager for CTA's rail engineer

---

[1]CTA's administrative procedure 110 defines "chargeable mileage" as "miles traveled for qualified business use, [which] include the miles traveled between destinations, up to five miles from home and five miles to home on routine assignments." Nonchargeable mileage are those miles traveled in excess of five miles to and from home on routine assignments and are not subject to reimbursements.

and technical services. Malec confirmed that there were "unusual patterns" in the plaintiffs' mileage records that warranted further investigation. Thereafter, Bobko reviewed two additional months of the plaintiffs' mileage records, as well as logs of their CTA employee transit card swipe patterns. Bobko discovered multiple incidents in which the locations of the plaintiffs, as revealed by the transit card swipes, did not match the locations that the plaintiffs logged on the mileage records.

In April 2005, Malec conducted separate interviews with each plaintiff regarding the discrepancies in their records. Plaintiff Arroyo stated that he was unaware that he had to go to assigned locations and that one of the retired senior technicians informed him that he could travel to various locations. Arroyo asserted that he was instructed to record his mileage numbers consecutively. Arroyo attributed the discrepancies in his records to errors made on his mileage sheets, stated that he prepared his mileage sheets at the end of the month, and admitted that he "never kept accurate records." Arroyo also stated that he may have left work early a few times a month without permission.

To account for the record discrepancies, Horbach admitted to Malec that he "kept poor records" of his mileage logs, which he created at the end of each month, and noted that he did not always swipe his CTA transit card while present at certain stations. However, he asserted that he was told to keep a "running log" of the vehicle mileage used in the course of his field work. Horbach also maintained that his mileage records reflected where he actually traveled and that scheduling changes accounted for part of the confusion in the recordkeeping. The plaintiffs were then suspended without pay pending further investigation.

In May 2005, Malec conducted a second interview with each plaintiff separately. In Arroyo's follow-up interview, Malec stated that he reviewed a total of six months of records and that "there were 36 different entries of fraudulent mileage totaling [$272.25]." Arroyo admitted that the records reviewed by Malec accurately showed that Arroyo left work early on nine occasions in January 2005. He did not recall going to all of his monthly field assignments, but he stated that it did not matter as long as he went to work at another CTA shop.

During Horbach's follow-up interview, Malec informed him that a review of several additional months of records revealed that Horbach sought mileage reimbursements totaling $489.32 for 57 trips he allegedly made to the 98th Street garage. Although Malec stated that no managers or repairers recalled seeing Horbach at the 98th Street garage on those occasions, Horbach maintained that he was present

and had parked his car and ridden the train from the 98th Street garage on those days.

On May 31, 2005, in two separate memoranda written to the vice president of rail operations, Malec recommended that the plaintiffs be discharged on various grounds. The bases for Arroyo's discharge included his repeatedly leaving work early without permission; fraudulently claiming mileage reimbursements from CTA; changing work assignments without permission; and failing to be at assigned field locations. Malec also recommended that Horbach be discharged for falsifying his mileage records; abusing company time; changing work assignments and leaving work without permission; and failing to be at his assigned field locations. Malec noted that the plaintiffs violated CTA Rules 7, 14, 18 and 24.[2] In June 2005, notices of discharge were sent to the plaintiffs, which effectively terminated their employment with CTA.

From August to December 2005, a joint hearing was held before the Board under section 28 of the Act (70 ILCS 3605/28 (West 2006)). The plaintiffs were each represented by counsel. At the hearing, CTA presented the testimony of three witnesses. Bobko testified to the details of the investigation and the plaintiffs' subsequent interviews with Malec, as discussed above. Malec also testified on CTA's behalf and gave his reasons for recommending the plaintiffs' discharge, as outlined in the May 31, 2005, memoranda. Malec stated that between August 2004 and January 2005, all technicians prepared their mileage logs in the same manner as the plaintiffs. However, Malec admitted that he never instructed anyone on how to properly prepare their mileage sheets for reimbursements and that the plaintiffs' supervising manager was in charge of approving the plaintiffs' mileage sheets.

CTA also presented the testimony of Douglas Johnson, manager for rail maintenance at the 98th Street location. Johnson testified that out of all the dates between December 2004 and February 2005 that Horbach claimed to have performed work at the 98th Street garage, he could only recall seeing Horbach there on two occasions.

The plaintiffs also testified at the hearing. Horbach testified that other technicians informed him to "keep a block of running numbers" for the mileage logs and "not to show any gaps" in the numbering. None of Horbach's superiors ever spoke with Horbach about how to keep track of his mileage usage, and Malec had never questioned Horbach about his mileage sheets. Horbach testified that he prepared his mileage sheets quickly at the end of each month with the help of his

---

[2]Rule 7: Obedience to Rules; Rule 14: Personal Conduct; Rule 18: Reporting for Duty; and Rule 24: Use of Best Judgment.

notes and a calendar. Horbach believed he correctly prepared his mileage sheets because they were never questioned in monthly meetings or returned to him. Regarding the CTA transit card swipe patterns, Horbach testified that he was instructed by one of his managers to swipe his CTA transit card 10 times a month, but was not told where, when or how to swipe it. He would often neglect to swipe his CTA transit card despite being on CTA property. Horbach further testified that he went to the 98th Street location approximately three times a week, although the location was not part of his field assignments. However, he noted that a manager told him to "start in the field and then end up close to home at the end of the day," which Horbach interpreted to mean the closest shop to his home—the 98th Street station.

Arroyo testified that he was informed by a manager and fellow technicians to "keep the mileage running" by recording mileage usage as one continuous block of numbers, without any breaks to reflect the use of his vehicle during personal time away from work. Arroyo prepared his mileage sheets at the end of each month and denied intentionally defrauding CTA in seeking mileage reimbursements. He stated that he was instructed by his manager to "end [the] day close to home." Unlike the statements Arroyo made to Malec during his interviews, Arroyo testified that he had never left work early without permission in 2005.

On May 10, 2006, the Board passed two ordinances sustaining the plaintiffs' terminations from CTA.[3] On June 23, 2006, the plaintiffs filed separate but identical complaints against CTA and other CTA individuals[4] for administrative review in the circuit court of Cook County. On April 19, 2007, the trial court granted CTA's motions under section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619(a)(1) (West 2006)) to dismiss the plaintiffs' complaints. Subsequently, on May 18, 2007, the plaintiffs separately filed a two-count amended complaint for administrative review or, alternatively, petition for common law writ of *certiorari* (count I) and challenged the constitutionality of section 28 of the Act (count II).[5] On May 30, 2008, the plaintiffs filed a joint petition for writ of *certiorari*, alleging that the Board's findings of fact at the hearing were "contrary to law and against the manifest weight of the evidence," and that the plaintiffs'

---

[3]Ordinance No. 006—71 sustained the discharge of Carl Horbach. Ordinance No. 006—72 sustained the discharge of Michael Arroyo.

[4]These individuals are not parties to the appeal before this court.

[5]On August 22, 2007, the plaintiffs withdrew with prejudice count II of their amended complaints.

terminations were excessive and punitive. On August 14, 2008, the trial court denied the plaintiffs' petition for writ of *certiorari* and affirmed the Board's decisions to discharge the plaintiffs. On September 3, 2008, the plaintiffs separately filed a notice of appeal before this court. On September 11, 2008, Arroyo filed an amended notice of appeal.[6] On January 5, 2009, this court granted the plaintiffs' motion to consolidate their appeals before this court.

## ANALYSIS

We determine the following issues: (1) whether the trial court lacked subject matter jurisdiction to review the Board's decisions in terminating the plaintiffs; (2) if not, whether the Board's findings were against the manifest weight of the evidence; and (3) whether the Board's decisions to discharge the plaintiffs were arbitrary and unreasonable.

We first determine *de novo* whether the trial court lacked subject matter jurisdiction to review the Board's decisions in terminating the plaintiffs. *Bono v. Chicago Transit Authority*, 379 Ill. App. 3d 134, 139, 882 N.E.2d 1242, 1246-47 (2008). CTA argues that the trial court lacked jurisdiction to review the Board's decisions because the Act (70 ILCS 3605/28 (West 2006)) does not expressly adopt the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2006)) and the plain language of the Act precludes judicial review under the common law writ of *certiorari*. CTA further urges this court not to follow the holding in *Bono. Bono*, 379 Ill. App. 3d 134, 882 N.E.2d 1242.

When a statute conferring power on an administrative agency does not expressly adopt the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2006)) or provide for any other form of review, a common law writ of *certiorari* generally serves as a method for obtaining judicial review of administrative actions. *Russell v. Department of Natural Resources*, 183 Ill. 2d 434, 440-41, 701 N.E.2d 1056, 1059 (1998); *Lapp v. Village of Winnetka*, 359 Ill. App. 3d 152, 166, 833 N.E.2d 983, 995 (2005). Here, the Act has not expressly adopted the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2006)) as a method for reviewing the Board's decisions. However, "the normal rules of statutory construction must be followed to determine if judicial review is limited or entirely precluded," before determining if a writ of *certiorari* is proper to review the Board's findings. *Bono*, 379 Ill. App. 3d at 140, 882 N.E.2d at 1247.

Section 28 of the Act (70 ILCS 3605/28 (West 2006)) states in pertinent part:

---

[6]The amended notice of appeal reflected the correct circuit court case number (No. 06 CH 12498).

"No officer or employee in regular employment shall be discharged or demoted *except for cause which is detrimental to the service.* Any officer or employee in regular employment who is discharged or demoted may file a complaint in writing with the Board within ten days after notice of his or her discharge or demotion. \*\*\* The Board shall grant a hearing on such complaint within thirty (30) days after it is filed. \*\*\* If the Board finds, or approves a finding of the member or committee appointed by the Board, that the complainant has been unjustly discharged or demoted, he or she shall be restored to his or her office or position with back pay. *The decision of the Board shall be final and not subject to review.* (Emphases added.) 70 ILCS 3605/28 (West 2006).

In *Bono*, a CTA employee was discharged for the improper personal use of the telephone in making a call to a customer. *Bono*, 379 Ill. App. 3d at 135, 882 N.E.2d at 1244. The Board affirmed the employee's termination after a section 28 hearing. *Bono*, 379 Ill. App. 3d at 139, 882 N.E.2d at 1246; 70 ILCS 3605/28 (West 2006). The discharged employee then sought review of the Board's findings by filing a writ of *certiorari,* after which the circuit court upheld the Board's decision to terminate. *Bono*, 379 Ill. App. 3d at 139, 882 N.E.2d at 1246. On appeal, CTA argued that the plain language of section 28 of the Act "clearly evidences the legislature's intent to preclude judicial review of any Board decision." *Bono*, 379 Ill. App. 3d at 140, 882 N.E.2d at 1247.

The *Bono* court held that when viewed in its entirety, "section 28 is unclear as to whether the Board has unreviewable discretion in discharging an employee" because the statutory language stating that "the decision of the Board shall be final and not subject to review" appears directly after a discussion regarding employees who have been unjustly discharged, making it uncertain if all review is precluded. *Bono*, 379 Ill. App. 3d at 141-42, 882 N.E.2d at 1248; 70 ILCS 3605/28 (West 2006). The *Bono* court further held that "in addition to the express language of the statute, we must consider the structure and objectives of the statutory scheme and whether the standards exist to support review and the nature of the action involved." *Bono*, 379 Ill. App. 3d at 141, 882 N.E.2d at 1248, citing *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 497-98, 524 N.E.2d 561, 577 (1988). The court then concluded that review of the Board's decision was proper under a common law writ of *certiorari* because section 28 contains a "cause detrimental to the service" standard that was sufficient to support review of discharge cases. *Bono*, 379 Ill. App. 3d at 142, 882 N.E.2d at 1249. Thus, the Board's "presumption of reviewability" may not be overcome. *Bono*, 379 Ill. App. 3d at 142, 882 N.E.2d at 1249.

We agree with the holding in *Bono* that the Board's decisions are reviewable. However, we must clarify that unlike the *Bono* court, we do not believe section 28 is unclear as to whether the Board has unreviewable discretion in discharging an employee. Instead, we find that the language of unreviewability at issue here—which states that "the decision of the Board shall be final and not subject to review"— only precludes further appeal or review before the Board, in the context of the agency, but does not preclude judicial review of Board decisions. See generally *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 333 (2009). To hold otherwise would allow CTA unfettered discretion to discharge employees in regular employment for any perceived "cause," and the only recourse afforded to aggrieved employees would be to appear for a hearing before the Board of the agency that terminated them, without any means of reviewing the actions of the Board to ensure due process of law. See *Reyes v. Walker*, 358 Ill. App. 3d 1122, 1125, 833 N.E.2d 379, 381 (2005), quoting *Reichert v. Court of Claims*, 203 Ill. 2d 257, 260, 786 N.E.2d 174, 177 (2003) (" 'common law writ of *certiorari* provides a means whereby a party who has no avenue of appeal or direct review may obtain limited review over action by a court or other tribunal exercising quasi-judicial functions. \*\*\* The purpose of *certiorari* review is to have the entire record of the inferior tribunal brought before the court to determine, from the record alone, whether the tribunal proceeded according to applicable law' ").

We also agree with the *Bono* court that section 28 provides a standard sufficient to support review. The "cause detrimental to the service" standard allows this court to review the Board's decisions to determine if the plaintiffs' conduct was " ' "detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for [their termination].' ' " *Bono*, 379 Ill. App. 3d at 142, 882 N.E.2d at 1249, quoting *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 551, 426 N.E.2d 885, 887 (1981), quoting *Kreiser v. Police Board*, 40 Ill. App. 3d 436, 441, 352 N.E.2d 389, 394 (1976). Thus, review by the circuit court under the common law writ of *certiorari* was proper.

Turning to the merits of the appeal, we next determine whether CTA's findings were against the manifest weight of the evidence. The standard of review of an administrative decision under a common law writ of *certiorari* is the same standard of review used under the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2006)). *Bono*, 379 Ill. App. 3d at 143, 882 N.E.2d at 1249. The findings and conclusions by the Board on questions of fact are accepted as *"prima*

*facie* true and correct" and must be upheld on review unless they are against the manifest weight of the evidence. *Lapp*, 359 Ill. App. 3d at 167, 833 N.E.2d at 996. "Administrative decisions are against the manifest weight of the evidence when the court, viewing the evidence in the light most favorable to the administrative agency, determines that no rational trier of fact could have agreed with the agency's decision and that an opposite conclusion is clearly evident." *Lapp*, 359 Ill. App. 3d at 167, 833 N.E.2d at 996. However, it is not the function of a reviewing court to reweigh the evidence or assess the witnesses' credibility; and "if there is evidence of record that supports the agency's determination, it must be affirmed." *Bono*, 379 Ill. App. 3d at 143, 882 N.E.2d at 1249-50.

The plaintiffs argue that the Board's findings were against the manifest weight of the evidence because the record shows that the plaintiffs did not have the intent to willfully submit false mileage sheets and that discrepancies between the mileage records and CTA transit card swipe patterns could be explained by poor recordkeeping. The plaintiffs specifically argue that they were told to record consecutive mileage numbers and to swipe their CTA transit cards 10 times per month, and that field assignments often changed.

We find that many of the arguments that the plaintiffs raise on appeal were properly resolved by the trier of fact—in this case, the Board. The record reveals that the plaintiffs' mileage sheets contained consecutively recorded odometer readings, without any breaks to reflect personal use of their vehicles during nonwork hours and that the plaintiffs sought mileage reimbursements based on those odometer readings. In other words, according to the plaintiffs' odometer records, their personal vehicles were being used exclusively for CTA travel during the periods of time in question. At the hearing, no managers or senior technicians testified in support of the plaintiffs' assertion that they were instructed to record their mileage in this manner. CTA presented the testimony of Bobko, who testified that in the course of the investigation, he discovered multiple incidents in which the locations logged by the plaintiffs on their mileage sheets did not match their actual locations, as revealed by the transit card swipe records. Although the plaintiffs attributed these discrepancies to poor recordkeeping, scheduling changes, or general neglect in swiping their transit cards, the Board, as the trier of fact, was free to weigh the evidence and disregard any testimony it did not find credible.

During Arroyo's interviews with Malec, Arroyo stated that he was unaware that he had to go to assigned work locations, as long as he traveled to various locations within a given month. Arroyo admitted to Malec that the records accurately showed Arroyo leaving work early

without authorization on nine occasions in January 2005. However, he testified at the hearing that he "never left work early without permission in 2005." Horbach's mileage records also indicated that he frequently started or stopped his workday at a rail station close to his home, regardless of whether that was an assigned work location. Horbach also sought mileage reimbursements for 57 trips that he supposedly made to the 98th Street garage. However, Johnson, testifying on behalf of CTA, stated that he only recalled seeing Horbach at the 98th Street garage on two occasions. Although the plaintiffs testified that their manager allowed them to "end the day close to home," neither plaintiff presented their manager's testimony to support this claim.

We hold that the facts of the record sufficiently support the Board's findings that the plaintiffs engaged in multiple instances of employee misconduct. CTA has presented evidence of discrepancies between the plaintiffs' mileage records and their transit card swipe patterns, that the plaintiffs left work early without permission and failed to report to their assigned field locations. Thus, the Board was free to find that the plaintiffs' whereabouts during work hours were questionable, that the plaintiffs fraudulently sought reimbursement for traveling to unassigned locations, and that the plaintiffs abused company time. We do not find that an opposite conclusion is clearly evident when the evidence is viewed in the light most favorable to CTA; therefore, we hold that the Board's findings were not against the manifest weight of the evidence.

We next determine whether the Board's decisions to discharge the plaintiffs for cause, based on the factual findings, were arbitrary and unreasonable. An agency's decision may be reversed as arbitrary or unreasonable if it "relies on factors that the statute does not intend, fails to consider an issue, or the decision is *** implausible." *Bono*, 379 Ill. App. 3d at 144-45, 882 N.E.2d at 1251. However, a reviewing court gives "great deference to the Board's decision because it is in the best position to determine the effect of the [plaintiffs'] actions on its operations." *Bono*, 379 Ill. App. 3d at 145, 882 N.E.2d at 1251. Similarly, "we may not consider whether we would have imposed a more lenient disciplinary sentence"; thus, review is limited to a determination of whether the Board "acted unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service." *Krocka v. Police Board*, 327 Ill. App. 3d 36, 48, 762 N.E.2d 577, 588 (2001).

Under section 28 of the Act, CTA employees may be discharged "for cause which is detrimental to the service." 70 ILCS 3605/28 (West 2006). The plaintiffs argue that fundamental fairness dictates that this court remand the matter to the Board to reconsider an ap-

propriate disciplinary action short of discharge, and they cite several cases in support of their claim.

We find the plaintiffs' reliance on *Basketfield v. Police Board*, 56 Ill. 2d 351, 307 N.E.2d 371 (1974), unpersuasive. In *Basketfield*, a police officer was discharged for misconduct such as obtaining unauthorized control of property; conspiring with other police officers to gain unauthorized control of property; rendering a false report of the incident; and failing to notify superiors of the misconduct of fellow officers under his command. *Basketfield*, 56 Ill. 2d at 360, 307 N.E.2d at 376. Our supreme court found that the discharge of the police officer was against the manifest weight of the evidence because the most serious allegations against the discharged officer were based on the unreliable testimony of one investigating police officer. *Basketfield*, 56 Ill. 2d at 359, 307 N.E.2d at 375-76. However, the less serious allegations against the police officer—such as his failure to conduct a proper investigation and failure to comply with a superior's order—were supported by the evidence. *Basketfield*, 56 Ill. 2d at 361, 307 N.E.2d at 376. Thus, our supreme court held that discharge was not appropriate because the most serious charges against the police officer were not sustained, and remanded the matter to the Police Board to consider an appropriate discipline. *Basketfield*, 56 Ill. 2d at 361, 307 N.E.2d at 376.

Here, unlike *Basketfield*, much of CTA's evidence supporting the plaintiffs' discharge was neither discredited, contradicted, nor rebutted with evidence. Instead, aside from the plaintiffs' testimony at trial denying certain allegations of misconduct, the plaintiffs have only attributed discrepancies regarding their whereabouts to "poor recordkeeping." Thus, the plaintiffs failed to show that the most serious charges against them were unsupported by the evidence, which would have rendered termination inappropriate.

Likewise, we find the facts of *Kreiser v. Police Board* distinguishable. *Kreiser v. Police Board*, 40 Ill. App. 3d 436, 352 N.E.2d 389 (1976). In *Kreiser*, a police officer was discharged for driving an unlicenced personal vehicle; disobeying an order to submit a written report; falsely reporting to his superior that he was not driving an unlicensed vehicle; falsely stating he had permission to be on a lunch break; and failing to properly "sign out" before attending traffic court. *Kreiser*, 40 Ill. App. 3d at 439-40, 352 N.E.2d at 392-93. In reversing the police board's findings, this court held that the misconduct was not "sufficiently substantial or so significantly related to the performance of [his] police duties as to demand the maximum penalty of discharge." *Kreiser*, 40 Ill. App. 3d at 441-42, 352 N.E.2d at 394. On appeal, our supreme court agreed that termination was not warranted and

remanded the case to the Police Board to impose an appropriate sanction. *Kreiser v. Police Board*, 69 Ill. 2d 27, 31, 370 N.E.2d 511, 513 (1977).

In the instant case, unlike *Kreiser*, the plaintiffs' misconduct significantly related to the performance of their work duties. As technicians, the plaintiffs were given field assignments and required to inspect and perform maintenance work at different rail and bus terminals. By failing to report to their assigned field locations and by leaving work early without permission, the plaintiffs impeded the core duties of their positions. Moreover, because traveling was a major part of their workday, falsification of the plaintiffs' mileage sheets, which amounted to fraudulent reimbursements totaling $272.25 for Arroyo and $489.32 for Horbach, further undermined the integrity of their positions and the system.

The plaintiffs also rely on two cases to further support their argument for a disciplinary action other than discharge. See *Christenson v. Board of Fire & Police Commissioners*, 83 Ill. App. 3d 472, 404 N.E.2d 339 (1980); *Humbles v. Board of Fire & Police Commissioners*, 53 Ill. App. 3d 731, 368 N.E.2d 1049 (1977). We find these cases unpersuasive because they both involved a single incident of misconduct by a police officer, and the misconduct was unrelated to the public duties of his position. Likewise, we agree with CTA that several other cases cited by the plaintiffs are inapposite, and need not be addressed here, because they involved police officers who engaged in misconduct while off duty. See *Massingale v. Police Board*, 140 Ill. App. 3d 378, 488 N.E.2d 1289 (1986); *Tinner v. Police Board*, 62 Ill. App. 3d 204, 378 N.E.2d 1166 (1978); *Kirsch v. Rochford*, 55 Ill. App. 3d 1042, 371 N.E.2d 899 (1977).

Here, the plaintiffs' misconduct occurred over the course of several months, during their assigned work hours. We hold that the falsification of mileage records, misrepresenting work locations, leaving work early without permission and failing to work at designated field locations were "detrimental to the discipline and efficiency" of CTA's service and, thus, were sufficient cause for discharging the plaintiffs. See *Bono*, 379 Ill. App. 3d at 142, 882 N.E.2d at 1249. Therefore, the Board's decisions to terminate the plaintiffs were not arbitrary or unreasonable.

Affirmed.

HOFFMAN and KARNEZIS, JJ., concur.