GERALD T. SHALLOW, Plaintiff-Appellant, *v.* POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (4th Division)    No. 79-1576

Opinion filed April 23, 1981.

Lawrence W. Krupa, of Chicago, for appellant.

William R. Quinlan, Corporation Counsel, of Chicago (Robert R. Retke and Cheryl L. Smalling, Assistant Corporation Counsel, of counsel), for appellees.

Mr. JUSTICE LINN delivered the opinion of the court:

Plaintiff, Gerald T. Shallow, filed a complaint for administrative review in the circuit court of Cook County seeking to set aside the decision of the Police Board of the City of Chicago which had ordered that he be discharged from the police department. The circuit court affirmed the decision of the Board.

On appeal, we reversed and remanded (*Shallow v. Police Board* (1978), 60 Ill. App. 3d 113, 376 N.E.2d 1025). On remand, we directed that

the record be supplemented to contain the Police Board's findings of fact and its decision and for further hearings determined to be necessary.

In subsequent proceedings before the trial court, the city of Chicago amended its answer to include the Police Board's findings of fact and decision. The trial court sustained the findings of fact and again affirmed the decision of the Board ordering plaintiff's dismissal. Plaintiff appeals contending, *inter alia*, that the Board's findings and decision are against the manifest weight of the evidence.

We reverse.

The document entitled, "FINDINGS AND DECISION," dated May 24, 1973, states in pertinent part:

> "On October 6, 1971, the Superintendent of Police filed charges with the Police Board of the City of Chicago against SERGEANT GERALD SHALLOW, STAR NO. 1021, for violating the following rules:
>> Rule 2—Any action or conduct which impedes the Department's efforts to achieve its goals, or brings discredit upon the Department.
>> Rule 13—Making a false report, written or oral.
> The Police Board of the City of Chicago, as a result of its investigation of the charges, finds and determines that:
>
> * * *
>
> 3. The hearing on the charges was had before GARLAND W. WATT, Hearing Officer of the Police Board, on February 13, 1973, February 14, 1973, March 6, 1973 and April 6, 1973.
> 4. Throughout the hearing the Respondent did appear in person, and was represented by legal counsel of his own choosing.
> 5. The Respondent as charged herein, contrary to the Rules and Regulations of the Department of Police, is guilty of violating Rule 2, 'Any action or conduct which impedes the Department's efforts to achieve its goals, or brings discredit upon the Department', as set forth in findings 6, 7 and 8 hereof, in that his conduct is not that which the Department expects from a reasonable, prudent, diligent and cautious officer.
> 6. The Respondent as charged herein, contrary to the Rules and Regulations of the Department of Police, is guilty of violating Rule 2, 'Any action or conduct which impedes the Department's efforts to achieve its goals or brings discredit upon the Department', in that on January 11, 1971 and for

some time prior thereto, he had unauthorized possession of a 1969 Toronado automobile, Illinois 1970 license plates, No. HP9214, which was the property of another, thus bringing discredit upon the Department.

7. The Respondent as charged herein, contrary to the Rules and Regulations of the Department of Police, is guilty of violating Rule 2, 'Any action or conduct which impedes the Department's efforts to achieve its goals, or brings discredit upon the Department', in that for some time prior to January 11, 1971 he did exercise control over a 1969 Toronado automobile bearing Illinois 1970 license plates, No. HP9214, which he knew or should have known was stolen, thus bringing discredit upon the Department.

8. The Respondent as charged herein, contrary to the Rules and Regulations of the Department of Police, is guilty of violating Rule 13, 'Making a false report, written or oral', in that on February 24, 1971 he did make an official report to the Internal Administrations Division of the Chicago Police Department regarding on-going investigations regarding a stolen Toronado automobile. Said statement contained false and erroneous information."

At the hearing on the charges, two police officers, Robert Knightly and Donald Keevers, testified to the events surrounding the January 11, 1971, recovery of an abandoned car. Knightly testified that the car was a light colored 1969 or 1970 Toronado. Keevers described the car as a 1970 "black over green" Toronado with number HP9214 license plates. Both officers asserted that they did not search the car; the car was locked and no keys were recovered.

On cross-examination, Keevers stated that he was told to give his commanding officer a written report about the recovery of the abandoned vehicle. He noted that this procedure was "uncustomary and unusual"; he did not know why he had been given this order. Approximately one week or one month later, he submitted the report. Both Keevers and Knightly acknowledged that the written report indicated that the car's glove box had been locked. Keevers admitted he did not know whether the glove box was in fact locked because the "whole car" was locked. Knightly thought that either the car was open or they opened it. On redirect examination, Knightly asserted he could not remember whether the car doors were open or locked.

David Jahn, a claims supervisor for the Motors Insurance Company, testified that he had a conversation with one of his field adjustors concerning a 1969 Toronado. Jahn advised him to call the police department. Jahn then went to the Motors Insurance pound and he inspected a

green 1969 Toronado. Jahn asserted that Motors Insurance owned the car because they had paid "a claim on a John Romano, who had reported the car stolen in 1970 from Oak Park." Jahn could not remember the car's license plate number and it had not been recorded on his file. Jahn also stated he did not observe any articles in the car; "the articles had already been removed from the car."

Jahn testified, over objection, that he then proceeded to another office where he observed various articles which he had directed a Mr. Thompson to remove from the car. Jahn observed "a can of mace, several raincoats, a couple of name tags and a police sergeant's star. Jahn could not remember the name on the tags. Jahn told Thompson to call the police department and return the articles. Jahn assumed the articles belonged to the Chicago Police Department because a technical manual which was also recovered was labeled "Chicago Police Department."

On cross-examination, Jahn asserted that Thompson still worked for Motors Insurance Company. He also asserted that the car had been stolen in February 1970. At that time Romano owned the car. When the car was recovered by the police, on January 21, they towed it to the Chicago Police Pound. The car was then towed to the Motors Insurance Company pound. Jahn could not remember whether Thompson called before or after the car was towed to the Motors Insurance Company Pound. Jahn stated that Romano had surrendered the keys to the car and that Motors Insurance Company maintained possession of the keys.

Jahn also testified that the serial number on the can of mace, which he observed in Thompson's car trunk, was 681533. He also stated that Thompson's trunk contained two raincoats, one black and one yellow, and two name tags which were black with white lettering and a white edge. The police star, which he also observed, was not gold, but silver, and it had a crest across the top, unlike the star of another officer present during the hearing. The number on the star was not recorded, and Jahn could not remember it. The name on the name tags and the star also was not recorded in the file.

W. J. Weaver, Jr., an investigator with the legal department of the Shell Oil Company (Shell), testified to the billing recording procedure utilized by Shell. Weaver then examined two copies of invoices from Shell. The forms had plaintiff's name and account number on them. The license plate number PC8345 was recorded on one invoice; the other reflected license plate number PC8355. Both invoices were signed "G. Shallow."

Weaver also stated that the invoices were kept by Shell until Shell billed the customer, then the invoices are microfilmed and copies of these are kept for Shell's records. Weaver examined copies of the microfilmed invoices billed to the plaintiff's account reflecting an HP9214 license plate number. Four of the invoice copies were dated October 1970, and one of

these copies contained an illegible license plate number. One copy, dated June 1970, four copies dated July 1970, one copy dated September 1970 and one copy dated November 1970 had the license plate number HP9241 on them. All of the aforementioned copies were signed "Gerald Shallow." Two copies, dated August and March, 1970, respectively, had illegible signatures. The March 1970 copy had the license plate number CV6096. Another March 1970 invoice had a CM6744 license plate number and it was signed "Gerald Shallow." Weaver further testified that although the invoices were paid, he did not know who had paid them.

On cross-examination, Weaver acknowledged that prior to July 1970, Shell sent unsolicited credit cards to prospective customers. He also acknowledged that when a credit card is sent to a man who is married, his spouse frequently signs his name, instead of her name, on the credit card invoice. On redirect examination, Weaver stated that customers usually notify Shell if their credit card has been lost or stolen or if they have been charged for unauthorized purchases. The Shell records disclosed that plaintiff's billings were paid without complaint and on a regular basis. On re-cross-examination, Weaver asserted that the number of invoices he had reviewed and about which he testified during his direct testimony appeared to be a normal use of the credit card over a period of 25 weeks. At the close of Weaver's testimony, over plaintiff's objection, the copies of invoices were admitted into evidence.

Douglas Momeyer, an assistant state's attorney, testified that in the course of his investigation into the incident the plaintiff came to his office on July 8, 1971, and gave a statement. Plaintiff's counsel objected to Momeyer's testimony, arguing that the statement plaintiff gave was not the official report dated February 24 as listed in the charge. The city responded that the charge was not based on Momeyer's investigation or the conversation between plaintiff and Momeyer. Momeyer then testified to the substance of the conversation which was recorded by a court reporter.

In the statement to Momeyer, the plaintiff denied that he had driven a 1969 green Toronado car or that he had purchased gasoline for the car. He acknowledged that the various articles allegedly found in the car were his property. When asked if he had any gasoline credit cards, the plaintiff said no, he always paid cash for gas. He denied purchasing gas for other people. Momeyer then showed him copies of documents concerning a Shell credit card and he admitted the credit card was his. He also acknowledged that his last bill from Shell was received a week earlier. He also stated that to his knowledge, he had not been incorrectly billed by Shell. At the close of the questioning, plaintiff refused to sign the statement.

On cross-examination, Momeyer admitted that prior to his conversation with plaintiff, he believed plaintiff was guilty of possessing a 1969

Toronado. Momeyer indicated that the purpose of the interview was to gather evidence of plaintiff's guilt.

Emmett Smith, a court reporter employed by the state's attorney's office, testified that on July 8, 1971, he recorded the questions asked and the answers given in a conversation between Momeyer and plaintiff.

Nemiah Triplett testified that he was owner of a Shell gasoline station at 63rd and Damen streets. Triplett examined copies of the credit card invoices bearing the name Gerald Shallow. He identified plaintiff as one of his customers, but he could not recall any specific dates on which plaintiff was in the station. He thought he had served the plaintiff once but he never saw plaintiff driving a 1969 Toronado. The car he serviced was a 1964 or 1965 model, possibly a Chevrolet.

Sergeant John Ruddy testified that on January 28, 1971, he was assigned to the auto theft unit. Pursuant to orders from his commanding officer, Ruddy went to the Motors Insurance Company's garage. He obtained various items from the office of a Mr. Thompson. He inventoried the following articles: a raincoat, rubber-coverall, a police shield, two name plates bearing the name Shallow, a police emergency response manual and a tactical manual bearing the name Shallow, a fishing box, a helmet case, and a chapter 38 supplement to the Illinois Revised Statutes.

On cross-examination, Ruddy testified that he never observed any of the articles in a car; he observed them in the garage of Motors Insurance Company. He turned the articles over to the evidence and recovered property section of the Chicago Police Department. The record does not reflect where these articles were during the hearing; they were not admitted into evidence.

Sergeant Eugene Wisniewski, an investigator for the Internal Affairs Division of the Chicago Police Department, testified that on January 28, 1971, he examined a list of department equipment inventoried by the Auto Theft Section. Wisniewski then went to the Motors Insurance Company garage to examine the recovered 1969 Toronado. Later he returned with two photographers from the police crime laboratory who took photographs of the Toronado.

Over plaintiff's objection, Wisniewski testified that he searched the 1969 Toronado. The doors to the car were open. In the crevice between the front seat and the back of the seat, he discovered two colored photographs. Wisniewski identified these photographs and they were admitted into evidence.

Wisniewski further testified he had a conversation with plaintiff and he typed the questions and answers. Plaintiff acknowledged that the emergency response and tactical manuals, the raincoat, name tags, sergeant badge and helmet belonged to him; he denied that the rubber pants and fishing pole were his; and, he was not certain if the mace or the

chapter 38 supplement belonged to him. The fishing box belonged to his son; one of the pictures was of his niece and the other was of his dog.

On cross-examination, Ruddy asserted he first viewed the 1969 Toronado on January 29, 1971. About a month later, he returned with the photographers. He never requested that fingerprints be obtained from the car's surface. Ruddy also acknowledged that the police department could not locate the records which would indicate who had been issued the number registered on the mace can. Ruddy also acknowledged that plaintiff signed the report which he had typed. This report was not admitted into evidence.

Andy Cianfrani testified on plaintiff's behalf. In May 1971, Cianfrani sold the Shell Gas Station located at 63rd and Damen Streets to Nemiah Triplett. Cianfrani continued working there, but he could not remember serving plaintiff.

Pasquella Trella, a deputy sheriff with the warrants division, testified that he had known the plaintiff 10 to 15 years. They were neighbors and lived six houses away from each other. Trella saw plaintiff, "sometimes everyday." He never saw plaintiff driving a 1969 Toronado; he only saw him driving a 1965 green Oldsmobile. Trella also asserted that he had given Officer Wisniewski and assistant state's attorney Momeyer this information when Wisniewski questioned him. Although he had been subpoenaed to testify seven or eight times, he never testified. The first time Momeyer questioned him, he asked Trella whether he was "covering" for plaintiff. When Trella said no, Momeyer said, "We don't need you, I'm not going to use your testimony anyhow; you are excused."

Plaintiff testified that he had been a member of the Chicago Police Department almost 30 years; he had been sergeant since January 1961. He denied ever having possession or exercising control over the Toronado automobile, and he stated that he had been found not guilty of these criminal charges after a bench trial.

Plaintiff also indicated that his oldest son was arrested twice for stolen automobiles, and on an auto theft charge his son had been placed on one year supervision. On January 5, 1971, plaintiff and his family moved. There was no garage at his old address and they moved, by car, at least a hundred boxes containing family possessions.

Plaintiff also asserted that the photographs allegedly taken from the Toronado car were not his personal property; his youngest son carried them in his wallet. The fishing box also belonged to his son. Plaintiff questioned his son about the incident but received a negative response. On February 24, 1971, when plaintiff was questioned about the Toronado matter, he gave a handwriting sample and also agreed to submit to a polygraph examination, but the polygraph test was never performed.

Plaintiff further testified that his wife handled all financial matters;

plaintiff never paid any bills nor did he review them. He received two Shell credit cards; he kept one of the cards in his drawer. Plaintiff also stated that a sergeant's shield and name plates with any name could be obtained from any uniform store. In his experience as a police officer working on stolen automobile cases, in almost all instances, any late model automobile would have been examined so that fingerprints could be taken from the car's surface. Plaintiff also examined the signatures on the copies of the Shell invoices bearing the HP9214 license plate number and he asserted the signature on each billing was not his. Although it resembled his signature, it was not the same.

Captain David Purtell, a handwriting expert for the Chicago Police Department, testified that he compared the microfilmed invoices to the known handwriting sample given by plaintiff, but due to the poor quality of microfilm he could not form an opinion as to whether plaintiff's signature appeared on the invoices.

OPINION

Plaintiff contends that the findings and decision of the Board are against the manifest weight of the evidence. We agree.

■■ In reviewing an administrative decision, the agency's findings and conclusions are considered prima facie true and correct (Ill. Rev. Stat. 1977, ch. 110, par 274). If, however, the record does not disclose evidence supporting that determination, a reviewing court must not hesitate to grant relief. *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 307 N.E.2d 371; *Tinner v. Police Board* (1978), 62 Ill. App. 3d 204, 378 N.E.2d 1166.

■■ ■ In examining the record, the reviewing court must look at all the evidence in opposition to the challenged finding as well as the evidence which tends to support it. (*Veira v. Illinois Racing Board* (1978), 65 Ill. App. 3d 94, 382 N.E.2d 462.) The parties here agree that where a crime is charged in a civil proceeding, the evidence proving such a crime should be clear and convincing. (*Drezner v. Civil Service Com.* (1974), 398 Ill. 219, 75 N.E.2d 303.) Although defendant was found not guilty in a criminal proceeding, this finding does not preclude a civil proceeding based on the same charges since there is a different standard of proof in each proceeding.

The Board found that plaintiff violated Rule 2, any action which brings discredit upon the police department in that prior to January 11, 1971, plaintiff had unauthorized possession of, and exercised control over, a 1969 Toronado which he knew or should have known was stolen. The Board also found that plaintiff violated Rule 2, making a false official report, written or oral, in that on February 24, 1971, plaintiff made a false written or oral report to Internal Administrations Division concerning a 1969 stolen Toronado.

■■ The evidence presented to show that defendant possessed and exerted control over a stolen 1969 Toronado automobile is far from clear and convincing. The only evidence supporting the Board's finding is (1) copies of invoices reflecting credit purchases of gasoline for a 1969 Toronado license plate No. HP9214; (2) two photographs recovered by Officer Ruddy which plaintiff stated belonged to his son. While the copies of the credit card invoices disclosed that a signature similar to plaintiff's signature appeared on the invoices, plaintiff denied it was his signature that appeared on the invoices. The owner of the gas station remembered servicing plaintiff's car, but it was not a 1969 Toronado. A police officer who was also plaintiff's neighbor testified he had never seen plaintiff drive a 1969 Toronado. Thompson, the person who allegedly recovered from the 1969 Toronado what is suggested to be plaintiff's belongings, never testified; likewise the person from whom the vehicle was stolen never testified. The articles found in the car were not introduced into evidence.

In our view, the circumstantial evidence presented falls short of being clear and convincing proof of wrongdoing. *Hughes v. Board of Fire and Police Commissioners* (1974), 20 Ill. App. 3d 2, 312 N.E.2d 651. See also *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 307 N.E.2d 371; *Gadberry v. Chicago Police Department* (1976), 40 Ill. App. 3d 84, 351 N.E.2d 355; *Jones v. Civil Service Com.* (1979), 80 Ill. App. 3d 74, 399 N.E.2d 256 (two security guards observed police officer place cassette in his pants); *Norek v. Herold* (1975), 31 Ill. App. 3d 514, 334 N.E.2d 220 (police officer observed driving motorcycle which had stolen parts attached to it; owner of motorcycle parts testified they were stolen); *Austin v. City of East Moline Board of Fire and Police Commissioners* (1972), 7 Ill. App. 3d 537, 288 N.E.2d 113 (one officer observed another take a rifle, then heard him say he would take it home and then saw him drive towards his home); *Rizzo v. Board of Fire and Police Commissioners* (1971), 131 Ill. App. 2d 229, 267 N.E.2d 7 (police officer claimed he did not know 1967 Chevrolet which he had driven for 2 years was stolen but court could not believe that without such knowledge he would pay $2,280 cash to a stranger for a 1967 Chevrolet and receive certificate of title showing car to be a 1956 Chevrolet).

■■ The evidence also does not support the Board's finding that plaintiff made a false written report on February 24, 1971. Officer Wisniewski never testified that plaintiff reported false information; rather, plaintiff merely denied that he possessed or exerted control over the 1969 Toronado. The official report was never admitted into evidence. It appears that the Board's finding that plaintiff made a false report is based on the assumption that plaintiff did possess the automobile and therefore his denial was false. The evidence does not support this finding. Although

the evidence does show that in a July statement to Momeyer, plaintiff denied possessing any gasoline credit cards, which was untrue, this statement was not the February 24, 1971 official report upon which the charge was based. (See *Hughes v. Board of Fire and Police Commissioners* (1974), 20 Ill. App. 3d 2, 312 N.E.2d 651.) Thus, based on all the aforementioned reasons, we necessarily conclude the Board's findings were against the manifest weight of the evidence and cannot support the order discharging the plaintiff from his position with the Chicago Police Department.

Accordingly, the judgment of the circuit court of Cook County is reversed.

Reversed.

ROMITI, P. J., and JOHNSON, J., concur.