PAUL M. POLK, Plaintiff-Appellant, v. BOARD OF TRUSTEES OF THE POLICE PENSION FUND OF THE CITY OF PARK RIDGE et al., Defendants-Appellees.

First District (6th Division)   No. 1—91—3100

Opinion filed September 10, 1993.—Rehearing denied November 8, 1993.

Stanley H. Jakala, of Berwyn, for appellant.

Thomas F. McGuire, of Thomas F. McGuire & Associates, Ltd., of Long Grove, for appellee Board of Trustees of Police Pension Fund of City of Park Ridge.

JUSTICE EGAN delivered the opinion of the court:

Pursuant to section 3—114.1 of the Illinois Pension Code (Ill. Rev. Stat. 1987, ch. 108½, par. 3—114.1), the plaintiff, Paul Polk, requested a line-of-duty, or 65%, pension from one defendant, the Board of Trustees of the Police Pension Fund of the City of Park Ridge (the Board). After a hearing, the Board denied his request, but granted Polk a 50% non-duty pension. Polk filed a complaint for administrative review in the circuit court, and the trial judge affirmed the Board decision. The Board agrees that Polk is disabled, but contends that the disability occurred while Polk was off duty. Polk argues that he was injured while answering a police call. In this appeal, Polk contends that the Board's decision was against the manifest weight of the evidence and that he was denied due process when two Board members, Alan Oeste and Jeffrey Caudill, refused to recuse themselves from hearing his claim.

Polk and three other police officers, Andrew Krier, David Keller, and Joseph Burke, testified that they separately arrived at a disturbance call at the Edison Park Home, a home for juveniles, at approximately midnight on January 5, 1987. The four officers were asked to remove an upset male youth from a room on the second floor of a dormitory at the Home. The youth had barricaded himself behind a wooden bedroom door that Polk described as a "cheaper type interior door." The officers went upstairs to the door together. Polk "felt that [he] could take it down with [his] shoulder," and tried two or three times to knock down the door by stepping back from the door approximately 18 inches and then "ramming" the door with the side of his right shoulder. Polk was not able to open the door this way, and the officers determined that the youth had placed a dresser and other objects behind the door. They eventually tore the door and door frame out of the wall by kicking and pushing on the door together.

When Polk hit the door, on either the first or second try, he felt pain in his shoulder. He was not certain exactly when he first felt the pain because "everything was going so fast, the adrenaline is pumping," but he knew "when the whole call was over with, *** it was hurting" and "it seemed to [him]" that he felt pain as soon as he hit the door. While they were standing outside the door, Polk told the other officers he hurt his shoulder and rubbed his shoulder. Also, the shoulder was sore the next day, and he mentioned this in conversation after a police meeting. The shoulder was less sore on January 7, 1987. Polk completed his shift, which lasted from 10:45 p.m. to 6:45 a.m., on January 5, 1987. He also worked his entire assigned shift on January 6, 1987.

Krier, Keller, and Burke all saw Polk hit the door with his shoulder. Krier said that Polk "shouldered" the door at least three times. He observed Polk holding his shoulder after he hit the door, as if Polk was "in some kind of pain." Polk told Krier "within a short period of time after this incident" that his shoulder hurt. Keller testified that Polk shouldered the door two or three times, and that he "bounced back" off the door after he hit it. Keller saw Polk grab his shoulder after he hit the door. Polk did not mention to Keller that the shoulder hurt on January 5, 1987. After January 5, Keller saw Polk "cranking his shoulder" like he was trying to "loosen it up" and heard Polk say that his shoulder was painful. Keller believed this was between three days and two weeks after the incident. Burke heard Polk say that his shoulder hurt while they were outside the door on January 5; he saw Polk wince and grab his shoulder at the scene. Burke testified that Polk shouldered the door at least twice and bounced off the door each time.

Three officers who were not present at the Edison Park Home also heard Polk complain about shoulder pain after January 5, 1987. Officer Conley heard Polk complain about his shoulder two or three days after the incident on January 5. He noticed that Polk was moving "stiffly and awkwardly" and asked Polk what happened. Polk told Conley that he "had to go through the door with some kid" at the Edison Park Home. Officer Brunty, who was the best man at Polk's 1989 wedding, testified that Polk told him he injured his shoulder when he had to "go through" a locked door. Polk mentioned shoulder pain to Brunty several times, and first mentioned it within two weeks of January 5, 1987. Another friend of Polk's, Officer Coffman, testified that Polk told him between January 5 and 17, 1987, that he injured his shoulder at the Edison Park Home.

Polk did not immediately report the pain he felt from the incident and never told his direct shift supervisor about the incident. He testified that he had a high tolerance of pain and believed the shoulder would heal itself. Polk rarely called in sick and had an unusually high amount of accrued unused sick time. Polk called not filing a report immediately after the incident his "own stupidity," and explained that he never filed an accident report when he was injured in the past. After January 5, 1987, Polk attempted to play racquetball, but was unable to play because of shoulder pain. Polk could not remember exactly when this occurred, and testified that it was at the end of January or beginning of February 1987, though "it could even have been later."

Allen Clemmensen, a police officer of the Village of Rosemont, testified that he and Polk attempted to play racquetball sometime after January 5, 1987, but Polk quit because shoulder pain made it impossible for him to play. After this racquetball incident, Polk realized "it's just not healing *** maybe it's more than a bruise" and went to police commander Herzog to determine what steps he should take. Herzog told Polk to complete an accident report.

On April 24, 1987, Polk went to Lieutenant Jeffrey Caudill and asked to file an accident report regarding his shoulder. Caudill later testified that these reports should be completed as soon after the injury as possible and that a supervisor should be notified of the injury immediately. Caudill did not base this observation on any specific rule, however, but on his own understanding as a veteran Park Ridge police officer. To his knowledge, no officer had ever waited more than eight hours to orally report an injury to a supervisor. Caudill explained that he was not saying the accident did not happen, just that it was unusual for the report to be filed so long after the accident.

Commander Herzog established that the plaintiff had a "good to very good" or "excellent" record. His sick record was "excellent"; he would rarely call in sick. Herzog knew that Polk would experience back pain but would not complain of it generally. The plaintiff was back on "active and full duty" in March 1989, after surgery. Herzog was asked by Caudill if he had an opinion whether it was unusual for an officer to wait 108 days to report an incident in which he was injured. Herzog answered:

> "Many officers become injured while they're on duty. And most of them report it immediately. Some do. Some don't. In this instance, I feel Officer Polk probably should have reported it immediately. But I know that he has hurt himself, just like other officers hurt themselves on calls and do not report them be-

cause they don't believe that they're hurt that bad. That's my opinion."

After filing the report, Polk visited Dr. Prodromos and several other doctors. Eventually, Polk had three surgeries on his shoulder. The first surgery was in May 1987. Polk testified that the only cause of his shoulder problems was the incident at Edison Park Home. He was on light duty several times due to shoulder pain and surgery, but was on full active duty when he filed the accident report.

Dr. Prodromos testified that he performed the May 1987 surgery on Polk and had examined Polk many times before and after his shoulder injury. He could not determine how old the injury was when he operated. Though the injury could have been caused by sports activity, Dr. Prodromos testified that it probably was not sports-related. Dr. Prodromos explained that the injury was very consistent with Polk's story that he hurt his shoulder on a door and that, in his opinion, the Edison Park Home incident caused Polk's injury.

Dr. Fisher testified that he X-rayed and examined Polk on September 27, 1988, for a workers' compensation claim. He testified that it was his medical opinion that "there's a direct causal relationship" between Polk's activities at the Edison Park Home and his shoulder injury. He also explained that there was "no question" the type of injury suffered by Polk could be caused by a sports accident.

Dr. Goldstein, an orthopedic surgeon, testified that he examined Polk on June 7, 1989, at the request of the City. Polk told him that his injury was caused by shouldering a door. Dr. Goldstein testified that, "judging from the history *** and examining him, *** in all likelihood the two are related and there was causality" between the injury and the Edison Park Home incident. He did testify, however, that the pain and injury suffered by Polk could be caused by a sports accident.

After the Edison Park Home incident, Polk went on an annual snowmobile trip in Wisconsin with several officers and other individuals for seven days, approximately from January 17 to January 24, 1987. He testified that Dr. Prodromos told him he could snowmobile with his shoulder injury, but admitted that Dr. Prodromos did not tell him this until after his first surgery. During this January 1987 trip, he drove a snowmobile for between four and six hours a day; for approximately 10 hours a day he usually was out of the cabin where the group slept. He explained that the riding was not constant because the group would stop for meals and rest breaks. He rode a snowmobile that he owned jointly with Officer Coffman. Polk explained that the group members would occasionally ride snowmobiles belonging to

other group members, to "try" new or different snowmobiles. Coffman also testified that group members occasionally rode each others' snowmobiles.

Polk stated that his whole body, especially his shoulder, was sore after he rode the snowmobile, though he usually could keep his right arm down at his side and drive with his left hand. To eliminate stiffness and pain, Polk used a jacuzzi every evening and also sometimes used ice on his shoulder.

Clemmensen testified that Polk complained about pain in his shoulder during the January 1987 trip, and he believed that Polk used the jacuzzi and ice packs during the January 1987 outing. Polk explained that he took snowmobile trips despite the pain because he enjoyed snowmobiling.

Clemmensen organized snowmobiling trips for a group every winter. For several years, the group went snowmobiling in Wisconsin during the third week of January. The men in the group often took a separate Wisconsin snowmobiling trip in December. Polk participated in all these trips. The group included several witnesses who testified for Polk: Clemmensen, Laurie and Tim Anderson, and Coffman. Polk saw the Andersons only once a year. Polk testified that he had never seriously crashed a snowmobile. Several other members of the group damaged their snowmobiles, however. During the men's December 1986 trip, Coffman hit a tree with his snowmobile, causing extensive damage. Coffman testified that he was able to ride the snowmobile during the rest of the December trip, but paid $570 to repair it after he returned to Illinois.

Laurie Anderson testified that, during the January 1987 trip, Polk hit the side of her snowmobile while making a turn. Polk explained that he "dinged" her snowmobile, though he was not sure exactly when this occurred. In addition to Laurie Anderson, Tim Anderson, Coffman, and Clemmensen all testified that this took place in January 1987. Polk was going very slowly, two or three miles per hour, and Laurie Anderson was sitting still. Polk was making a U-turn in a wide area and hit the side of Laurie Anderson's snowmobile as he was turning past her. Tim Anderson also saw this accident, and testified that Polk "was just barely moving." Polk, the Andersons, Clemmensen, and Coffman all testified no one was injured in the accident because Polk was moving so slowly, although Clemmensen and Coffman admitted they did not see it happen. Tim Anderson stated that there was not a great amount of damage initially visible, but that Polk caused a crack in the front of the fiberglass body of Laurie Anderson's snowmobile which cost $274 to repair. A February 5, 1987,

check for $280 from Polk to Tim Anderson was introduced into evidence. Polk and the Andersons testified that Polk paid the $280 to repair the snowmobile. There was no damage to Polk's snowmobile.

The Board presented the testimony of Park Ridge police officers Lisa Smith, William Bacon, and Edward Gallagher. Before Smith was called to the stand, Polk's attorney asked if anyone present had any written statements made by her. Her statements would not have been included in the original answers to discovery because she was not added to the witness list until the week she testified. The attorney for the Board asked any member of the Board who had a statement to mention it, and there was no response.

On October 25, 1989, Smith testified that she began dating Polk in August 1986, and initially went out with him "a couple times a week." Smith played racquetball with Polk two or three times in the first part of February 1987. She spoke with him when he returned from his snowmobiling trip on January 24 or 25, 1987. They were in Polk's house, and he told her that he was involved in a snowmobile accident while in Wisconsin. He told her that he injured his shoulder in this accident. Specifically, he told her he veered off the trail while driving a borrowed snowmobile and hit "either a tree or a tree stump." The snowmobile belonged to "some friend of Roger Coffman's, some woman that Roger knows." Polk told her he would have to pay to have the snowmobile repaired, and that it would cost "somewhere around three or five hundred dollars."

A "couple weeks" after the conversation in Polk's home, Polk told Smith he was "involved in a disturbance at the Edison Park Home and he was going to say he injured his shoulder during that incident." He told Smith this after they played a game of racquetball, probably in February 1987. She did not know exactly to whom Polk planned to tell this story; she thought "he was going to make a report on it." They broke up in late February, in part because she was involved with Bacon, whom she had dated occasionally since 1986. She admitted that she did not like Polk and that he upset her when he lectured her in March or April 1987, about dating Bacon, who was married and whose wife was pregnant.

Smith knew that Polk had filed a workers' compensation claim in 1988, but she did not tell anyone about their conversations regarding his injuries until she told Alan Oeste, a commander of the Park Ridge police department and a Pension Board trustee who was hearing the plaintiff's claim, three weeks before the day she testified. Smith testified that she "probably" was in violation of a police rule requiring officers to report any wrongdoing in the department immediately. She

explained that she did not want "to get involved," but was subpoenaed to testify at the hearing. Smith told Oeste about the conversations with Polk because Oeste had the police dispatcher send her to Oeste's house, where he asked her what she knew about the case. She agreed that the questioning was "highly unusual." She did not see Oeste taking any notes of this conversation, and she talked to him for approximately 15 minutes while standing in the street in front of his house. Oeste initiated the questioning and told Smith that "he had information that [she] might know more about this case."

The day before she testified, Smith discussed her testimony with Oeste and Lieutenant Jeffrey Caudill in Oeste's office at the station. (Caudill was also a trustee of the Board who was hearing the plaintiff's claim at the time.) They questioned her about Polk's statements and about snowmobile accidents and told her generally what she would be asked at the hearing. She saw them taking notes of this conversation. When Smith explained this, Polk's attorney requested the notes. A short recess was called and Oeste returned with the notes he said he took during their conversation the day before; Caudill stated that he did not take any notes of the conversation.

Polk's attorney requested that both Oeste and Caudill recuse themselves, in part because Oeste withheld the Smith interview notes. The attorney for the Board explained that the notes were not truly a statement made by Smith, but were just Oeste's personal notes of their conversation. Nonetheless, the attorney for the Board gave Oeste and Caudill an opportunity to recuse themselves. He told them both to be certain they could fairly and-impartially judge the matter before they decided to remain as judges. Both refused to recuse themselves. In the course of responding to Polk's attorney's argument that the notes should have been provided earlier, Oeste said the notes actually were not written until 12:30 p.m. on that day. When questioned about exactly when he made the notes, Oeste said, "It slips my mind," and then stated that the notes were written the day before.

William Bacon also testified on October 25, 1989. He started dating Smith in March 1987 and had been her boyfriend until April 1989. They resumed a relationship as friends within the last few weeks before he testified. Approximately two weeks before he testified, he had a discussion at the station with Caudill regarding the "January '87 snowmobile accident that took place." When asked how he knew about this accident, Bacon replied, "This conversation has been brought up several times over this last year between myself and probably about maybe ten other members of this police department with reference to this particular accident." He said that he had several

conversations with Clemmensen regarding Polk's shoulder in late winter or early spring of 1987. Bacon knew Clemmensen because Bacon had worked with him in the Rosemont police department. Bacon admitted that he had no first-hand knowledge of Polk's alleged January 1987 snowmobile accident.

A week before he testified, Bacon was called into Oeste's office, with Caudill also present, and was given a subpoena and questioned about "what he knew." He saw Oeste taking notes. There was no response by any Board member to the request of both the Board's attorney and Polk's attorney that anyone with written statements provide them. Bacon stated that, although "the alleged incident with the snowmobile" had been gossiped about in the department "for at least a year," he first spoke to a superior officer about this when he talked to Caudill two weeks before he testified.

Officer Edward Gallagher, a Board witness, testified that he had never heard from any source that Polk was going to claim falsely that he had been injured on the job when, in fact, he had been injured while snowmobiling. He testified that Bacon questioned him before September 9, 1989, about information he might have indicating that Polk had made a false claim. The day before he testified he called the attorney for the Board at the direction of Bacon and Oeste.

Pursuant to his own request, Bacon was called by the Board to testify a second time on November 2, 1989, "because [he] didn't know exactly what was going on before." Between these two hearing dates, he discussed Smith's testimony with her. Smith told him that she did not like Polk. Bacon said he did not feel "one way or the other" about Polk, but admitted that he loved Smith despite the fact that they stopped dating in April 1989. Bacon also admitted that he might have violated a police rule by not coming forward with this information sooner, but explained that he was reluctant because he did not know "for sure" and "it's a difficult thing to do."

Bacon elaborated on his conversations with Clemmensen during his second testimony and explained that they occurred at a White Hen Pantry where the men sometimes met for coffee when working late shifts. Bacon testified that he and Clemmensen were not friends, but that Polk's injury "just came up" in conversation. Bacon was not certain when these conversations occurred, but believed the first one was in February or March 1987. Over objection, Bacon testified that Clemmensen volunteered the information that Polk hurt his shoulder and damaged someone else's snowmobile when he "hit[ ] a tree or stump or post or something like that" during a January 1987 snowmobile trip in Wisconsin. Bacon stated that he and Clemmensen had

basically the same conversation at the same White Hen three times. He testified that the second conversation was approximately in March 1987, but later said it occurred in September 1987. The third discussion was "later" in 1987, and during this conversation Clemmensen "mentioned to [Bacon] *** that [Polk's] injury was going to go down as an on-the-job injury." Clemmensen never stated that Polk intended to make a false disability claim.

Bacon also testified that after he first testified he spoke to Gallagher and that Gallagher said he had knowledge of the fact that Polk was injured in a snowmobile accident and that if Gallagher were subpoenaed and testified under oath he would say that he had such knowledge. It was Bacon who had suggested to the Board that Gallagher be subpoenaed.

Polk and Clemmensen testified in rebuttal. Clemmensen said that Bacon was lying about the White Hen conversations. Further, he said that Bacon was disliked and distrusted by many Rosemont police officers and was known as a "back-stabber," who only wanted "to get ahead."

Polk testified that he never told Smith he hurt himself while snowmobiling and that he definitely did not tell her he was going to falsely claim a job-related injury. He explained that she seemed "strained" when he returned from the January 1987 trip, and that their relationship basically ended then. He was not friendly with her in February 1987, in part because that is when he lectured her about Bacon. Thus, at the time that she claimed he told her he would falsify the injury report, he "wasn't even dating her." He testified that he did not like either Smith or Bacon, and that Bacon "disliked him intensely" and would not even say "hello" to him at the station. He explained that Bacon waited for him after roll-call approximately two weeks after he told Smith she should not date Bacon and told Polk not to interfere in his relationship with Smith.

The Board's attorney ruled that Oeste could not vote on this matter because he missed one hearing day and because he retired before the voting date set by the Board. Oeste did not participate in any of the deliberations. The vote was held November 18, 1989, and only three Board members voted. Trustee John Patterson, who participated in the other hearing days, was not present at the vote because he resigned from the Board on November 11, 1989. Trustee Kurtis Frost, who replaced Oeste on the Board, did not vote or participate in the deliberations although he was present on November 18. Therefore, only three trustees were eligible to vote or deliberate; Caudill was one of the three. All three voted to find that Polk was disabled

and unable to perform the duties of a police officer; without deliberation, all three members voted that Polk was not entitled to the 65% line-of-duty disability pension.

The Board's written finding and decision, dated November 18, 1989, and signed only by Norman Pater, the president of the Board, states that Polk is disabled and that "while [Polk] has claimed that the cause of his disability occurred while on duty *** the Board does not accept said contention and instead concludes that [Polk] suffered his injury while off-duty."

The scope of judicial inquiry of factual determinations made by an administrative agency is limited to determining whether the agency's decision was contrary to the manifest weight of the evidence. While an agency's findings are considered *prima facie* true and correct, they must be based upon facts established by competent evidence. (*Savaglio v. Board of Fire & Police Commissioners* (1984), 125 Ill. App. 3d 391, 465 N.E.2d 1065.) If the record does not disclose evidence supporting the agency's determination, a reviewing court must not hesitate to grant relief. (*Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 307 N.E.2d 371.) A reviewing court may determine if the decision of the administrative agency is just and reasonable in light of all the evidence presented. (*Davern v. Civil Service Comm'n* (1970), 47 Ill. 2d 469, 269 N.E.2d 713.) In examining the record, the reviewing court must look at all evidence in opposition to the challenged finding as well as all evidence which tends to support it. (*Shallow v. Police Board* (1981), 95 Ill. App. 3d 901, 420 N.E.2d 618.) The administrative agency is the judge of the credibility of the witnesses; that does not mean, however, that reviewing courts may never determine that a witness' testimony has been discredited to a degree that acceptance of that testimony is contrary to the manifest weight of the evidence. (*Basketfield*, 56 Ill. 2d 351.) Finally, a reviewing court may draw inferences of fact from the record. *In re Application of the County Collector for Judgment & Order of Sale* (1971), 1 Ill. App. 3d 707, 274 N.E.2d 164; 107 Ill. 2d R. 366(a)(4).

As a threshold matter, we must consider the plaintiff's claim that the Board permitted inadmissible and prejudicial hearsay to be introduced through Bacon's testimony. Bacon testified that he had conversations with Clemmensen in which Clemmensen allegedly told Bacon that the plaintiff had hurt his shoulder in a snowmobile accident and that his injury was going to "go down as an on-the-job injury."

■ Generally, hearsay evidence is not admissible in an administrative proceeding. (*Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 606 N.E.2d 1111.) It is the position

of the Board that the testimony of Bacon was not hearsay because it was not received by the Board for the truth of what was said by Bacon. The Board states: "Instead Bacon's testimony was received by the Board to assist the Board in assessing the credibility of Lisa Smith and to determine what weight to be given to Smith's claims that Polk told her he would falsely claim to have been injured on duty." In other words, Smith's testimony of a "fact," that is, that Polk told her he had been injured in a snowmobile accident, would be corroborated by Bacon's testimony that Clemmensen told Bacon that Polk told Clemmensen the same thing that Polk had told Smith. In our judgment, Bacon's testimony of his conversation with Clemmensen was designed to prove the truth of what Smith testified to. This is hearsay and was not competent. Therefore, we will not consider Bacon's testimony of his alleged conversation with Clemmensen when deciding the question of the manifest weight of the evidence.

The undisputed medical evidence established that the plaintiff suffered a serious injury. Three officers who were with the plaintiff at the Edison Park Home testified that the plaintiff used his shoulder to try to knock down a door. One of the officers said the plaintiff complained of pain immediately. Another said that the plaintiff complained between three days and two weeks after the accident. The third said the plaintiff complained "within a short period of time" after the accident. Three other officers, who were not present at the accident, testified that the plaintiff complained to them before January 17, 1989, that he had injured his shoulder at the Edison Park Home. The testimony of these six officers that the plaintiff complained of pain to his shoulder before the January snowmobiling incident is of crucial importance. Where the testimony of a witness is neither contradicted by testimony or circumstances, nor inherently improbable, and the witness has not been impeached, that testimony may not be disregarded. (*People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81, 430 N.E.2d 1126.) The testimony of those witnesses is not contradicted by other testimony or circumstances, it is not improbable and has not been impeached. Moreover, the testimony of the three officers who were present on January 5 was corroborated by the independent evidence of a witness from the Edison Park Home, who testified that the officers had to knock the door down.

Dr. Goldstein testified, in response to a question by Oeste, that the injury could have been caused by throwing a football, a baseball, or by "some other sports-related activity." Dr. Fisher testified, again in response to a question by Oeste, that the injury could have come from throwing a baseball or a football or a racquetball. Dr. Prodromos

testified that when he first performed surgery on the plaintiff there was a partial tear in the rotator cuff and some scar tissue. In response to a question by Caudill, he said that that type of injury could be sustained by "people who engage in baseball, pitchers, people who are laborers for a long period of time with their arms elevated." In his opinion the plaintiff's injury could not have been sports-related. Everything the doctor saw was "perfectly consistent with what [the plaintiff] told [him]."

We note that Dr. Prodromos testified on October 25, 1989. Both Oeste and Caudill were aware on October 4 that Smith had told them of her alleged conversation with the plaintiff. Caudill had spoken to Bacon before Dr. Prodromos testified. Nonetheless, neither Dr. Prodromos, nor any other doctor, was asked any questions about a causal connection between the plaintiff's injury and snowmobiling.

The Board's entire case depends on the testimony of Smith and the fact that the plaintiff did not file a claim for job-related injuries until 108 days after the injury.

Smith's testimony was that the plaintiff told her he had been injured when he struck a tree or tree stump when he was driving someone else's snowmobile. The undisputed evidence, however, shows that the accident the plaintiff had after January 17 did not involve a collision with a tree or tree stump or while he was driving someone else's snowmobile. He was driving his own snowmobile, and the collision occurred when he struck Anderson's snowmobile while traveling "very slowly," "two or three miles per hour." All the witnesses said no one was injured, and it is most unlikely that anyone would be injured in a collision occurring while the plaintiff was "barely moving," as one witness testified. The testimony of the plaintiff and the other witnesses was corroborated by the check, dated February 5, 1987, from Polk to Anderson for the damages to Anderson's snowmobile.

Smith conceded that she did not like the plaintiff and that she was aware of her obligation to inform her supervisors of any wrongdoing on the part of a fellow officer; she did not do so. She was ordered to the home of her superior, Oeste, who told her he had information that she knew something about the case. What prompted Oeste and Caudill to seek out Smith after the hearing had begun was never disclosed. There is nothing in the record that there were rumors that Smith had information about Polk's claim. We do know, however, from Gallagher's testimony that Bacon was questioning Gallagher before the hearing began on September 16, 1989, about information Gallagher might have indicating Polk had made a false

claim. Gallagher also testified that he called the attorney for the Board at the direction of *Bacon and Oeste.*

Gallagher's testimony establishes unusual activity and interest on the part of Bacon. Unusual interest in the proceedings on the part of Bacon is disclosed by the fact that he suggested that Gallagher be subpoenaed and by the fact that he was recalled as a witness at his own insistence. The relationship between Smith and Bacon and the animosity between them and the plaintiff cannot be ignored. When Smith was asked if the plaintiff said he was going to make a report or if she knew he did make a report, she said, "I don't recall. I didn't really pay that much attention." Bacon said that in all the time of his relationship with Smith, they never discussed any statement Polk allegedly made to Smith about filing a false claim. Although we have determined that the contents of the alleged conversation between Bacon and Clemmensen were inadmissible hearsay, we may consider the extent of Bacon's role in the case and his potential influence on Smith. It is inconceivable to us that, if Polk had had the conversation with Smith to which she testified, she would not have told Bacon about it.

The Board's attorney conceded in oral argument in this court that Smith's testimony is essential to the Board's decision. In *Basketfield v. Police Board,* the defendant police board ordered that the plaintiff, a police captain, be discharged. The principal witness against the plaintiff was a police sergeant, who testified to a conversation with the plaintiff. The plaintiff testified that he had a conversation with the witness but he denied saying what the witness had testified he said. The supreme court affirmed the trial judge's determination that the decision of the board was against the manifest weight of the evidence. In doing so, the court focused on the difference between the testimony of the plaintiff and the testimony of the witness as to the contents of the conversation. The court pointed out that the witness' failure to include in his report certain statements allegedly made by the plaintiff "tends to diminish his credibility." (*Basketfield,* 56 Ill. 2d at 359.) The court also noted that the witness' testimony was refuted by another police officer; the court concluded that the witness' testimony was "totally discredited and its acceptance was contrary to the manifest weight of the evidence." (*Basketfield,* 56 Ill. 2d at 359.) In our judgment, the testimony of Smith of a conversation that allegedly occurred 2½ years before she testified, subject to all the infirmities disclosed by the record, is insufficient to overcome the unrebutted testimony of the plaintiff's witnesses.

■ We turn now to the Board's argument that the lapse of time between the occurrence on January 5 and the plaintiff's official report of an injury 108 days later is conclusive evidence that he was not injured on January 5. Officer Brunty testified that the plaintiff had a "great tolerance for pain" and that the plaintiff came to work even though he could "barely walk" because of arthritis. Officer Connelly testified that the plaintiff had always led the patrol officers in accrued sick time; that he could "take a lot of pain." Connelly also said that the plaintiff "made every effort to come to work and to do whatever the Department asked him," that "he tried to stay on the job and do the work."

When the president of the Board asked Dr. Goldstein about the lapse of time between January 1987 and the doctor's June 1987 examination, Dr. Goldstein said that after an injury it was "conceivable that one would get inflammation that was progressive and increasing." He knew that patients do not go to doctors right away. Some patients came to him two years after an injury.

The testimony of Connelly and Brunty was corroborated by Herzog and, to some extent, even by Caudill. The plaintiff had been a police officer for 19 years and had compiled a good record. He was anything but a malingerer. We find it very significant that the plaintiff did not decide he was unable to perform his duties as a police officer; the Department did. Lieutenant Polka, who was in charge of the police firing range, made a report on April 18, 1989, that the plaintiff would be unable to defend himself or others if he was "confronted with a situation that would require [him] to quickly and accurately fire [his] weapon." The plaintiff did not file his request for a disability pension until August 3, 1989, only after his superiors determined he could no longer function as a full-time police officer. When we examine all the evidence in opposition to the Board's finding and the evidence supporting it, we conclude that the decision of the Board is not just and reasonable in light of all the evidence presented. (See *Shallow*, 95 Ill. App. 3d at 908; *Davern*, 47 Ill. 2d at 471.) We conclude that the manifest weight of the evidence discloses that the plaintiff's injury occurred while he was on duty.

■ Before concluding this opinion, we wish to answer some of the arguments made by the Board concerning the participation of Oeste and Caudill. In its brief, the Board does not attempt to defend the actions of Oeste and Caudill. The Board's entire argument was that no prejudice inured to the plaintiff because Oeste did not vote and Caudill's vote was unnecessary. The Board's contention that Caudill's vote was not necessary is incorrect. Kurtis Frost, who re-

placed Oeste on the Board, was present at the time the Board made its decision, but he did not vote.

In oral argument in this court, the attorney for the Board suggested that the trustees are fiduciaries and have an obligation to conduct an investigation. We do not deny that the trustees are fiduciaries of the pension fund, but we wish to express our disagreement with any argument that the conduct of Oeste and Caudill was proper. We point out that they were also fiduciaries to the plaintiff.

Oeste was a commander and the executive officer of the Park Ridge police department. He was also the secretary of the Board. He was already on notice on October 3 that the lawyer for the plaintiff was raising a question about the propriety of Oeste conducting an investigation of the plaintiff's claim while he was a member of the Board and a question about Oeste discussing the case with another member of the Board, Lieutenant Caudill. It must be kept in mind that the hearing had begun. In response to a question by the plaintiff's attorney, Oeste said that he had not conducted "an investigation of this matter prior to the hearing." And yet, the following day, Oeste ordered Smith to appear at his home and answer questions after first telling her that he had information that she knew something about the case.

Caudill also was aware of what had transpired at the hearing on October 3, but Caudill also participated in *ex parte* investigations. In our judgment, the conduct of Oeste and Caudill was improper.

Proceedings under an administrative agency are subject to the requirements of due process of law. (*Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, 416 N.E.2d 1082.) A " 'fair trial in a fair tribunal is a basic requirement of due process.' " (*Scott*, 84 Ill. 2d at 54, quoting *In re Murchison* (1955), 349 U.S. 133, 136, 99 L. Ed. 942, 946, 75 S. Ct. 623, 625.) That principle applies to administrative agencies which adjudicate as well as to courts. (*Scott*, 84 Ill. 2d at 54-55, citing *Withrow v. Larkin* (1975), 421 U.S. 35, 46, 43 L. Ed. 2d 712, 723, 95 S. Ct. 1456, 1464.) *Scott* also instructs us that the combination of judicial and investigative functions is not a denial of due process. It is proper to have some blend of judicial and prosecutorial or investigative functions in an administrative proceeding *provided that the person performing the quasi-prosecutorial or investigative function is not a member of the decision-making body.* (*Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 530 N.E.2d 682.) Oeste and Caudill were members of the decision-making body and should not have acted as independent investigators, certainly not after the hearings had begun.

542

The impropriety of their conduct is compounded by the fact that they were questioning subordinates. The suggestion of coercion is obvious. There was no reason why they could not have given any preliminary information they had to the attorney for the Board.

For these reasons, the judgment of the circuit court is reversed.

Judgment reversed.

McNAMARA, P.J., and GIANNIS, J., concur.